In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## 24-1102

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellant,**

**v.**

**DAVID SARGENT,**

**Defendant-Appellee.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 22 CR 15 — Manish S. Shah, *Judge.*

# BRIEF AND SHORT APPENDIX
# OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

MATTHEW M. GETTER
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

JURISDICTIONAL STATEMENT ..................................................... 1

ISSUE PRESENTED FOR REVIEW ............................................. 2

STATEMENT OF THE CASE .......................................................... 2

SUMMARY OF ARGUMENT ......................................................... 17

ARGUMENT ........................................................................................ 19

The District Court Erred in Granting Defendant's Motions for Judgment of Acquittal and for a New Trial. .............................................. 19

   A.     Standard of Review .................................................................... 19

   B.     Analysis ......................................................................................... 21

      1.     The Evidence Was Sufficient to Allow a Rational Jury to Find Sargent Guilty of the Securities Fraud Counts Beyond a Reasonable Doubt. ................................................. 21

         a.     The Elements of the Offenses of Conviction ....................... 21

         b.     The Evidence Supported the Inference that Klundt Unlawfully Tipped Material, Non-Public Information to Sargent and that Sargent Traded on That Information. ...................................................................... 23

         c.     The Evidence Showed That Klundt Expected that Sargent Would Trade on the Insider Information He Disclosed. ............................................................................. 26

      2.     The District Court Improperly Substituted Its Own Judgment for that of the Jury. ............................................... 29

         a.     The district court's analysis failed to account for important evidence relating to the May 1, 2020, phone call. ................................................................................ 29

b.    The district court undervalued the evidence of Klundt's intent. ................................................................ 35

c.    The district court erred in determining that the evidence in this case was insufficient relative to the evidence presented in other securities fraud cases............ 40

3.    The Jury's Verdict Convicting Sargent of Securities Fraud Was Not Contrary to the Weight of the Evidence and Did Not Warrant a New Trial. ......................................... 45

CONCLUSION ................................................................................. 46

# TABLE OF AUTHORITIES

## CASES

*Carpenter v. United States*, 484 U.S. 19 (1987)................................................. 28

*Dirks v. SEC*, 463 U.S. 646 (1983) ................................................................ 41

*Liparota v. United States*, 471 U.S. 419 (1985)............................................. 39

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)..................... 38

*Rehaif v. United States*, 588 U.S. 225, 139 S. Ct. 2191 (2019)....................... 39

*Ruan v. United States*, 597 U.S. 450 (2022) .................................................. 39

*Salman v. United States*, 580 U.S. 39 (2016) ................................................ 41

*United States v. Bard*, 73 F.4th 464 (7th Cir. 2023) ..................................... 19

*United States v. Bhagat*, 436 F.3d 1140 (9th Cir. 2006)........................... 40, 43

*United States v. Brown*, 973 F.3d 667 (7th Cir. 2020) ................................... 20

*United States v. Chan*, 981 F.3d 39 (1st Cir. 2020) .................................*passim*

*United States v. Filer*, 56 F.4th 421 (7th Cir. 2022) .......................... 19, 20, 39

*United States v. Friedman*, 971 F.3d 700 (7th Cir. 2020) .............................. 21

*United States v. Godinez*, 7 F.4th 628 (7th Cir. 2021) ................................... 20

*United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023) .............................. 19, 20

*United States v. Harmon*, 721 F.3d 877 (7th Cir. 2013) ................................ 35

*United States v. Henke*, 222 F.3d 633 (9th Cir. 2000).................................... 44

*United States v. Heron*, 323 F. App'x 150 (3d Cir. 2009) .............................. 44

*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013)................. 20, 30, 31, 43

*United States v. Klein*, 913 F.3d 73 (2nd Cir. 2019) ..................................... 38

*United States v. Larrabee*, 240 F.3d 18 (1st Cir. 2001)...................... 28, 40, 43

*United States v. McClure*, No. 21-2689, 2023 WL 6051011 (7th Cir. Sept. 15, 2023)..................................................................................................... 20

*United States v. Peterson*, 823 F.3d 1113 (7th Cir. 2016) .......................... 20, 21

*United States v. Presbitero*, 569 F.3d 691 (7th Cir. 2009) .............................. 19

*United States v. Rajewski*, 526 F.2d 149 (7th Cir. 1975)................................ 29

*United States v. Rivera*, 901 F.3d 896 (7th Cir. 2018) .................................... 21

*United States v. Santos*, 20 F.3d 280 (7th Cir. 1994)...................................... 21

*United States v. Taylor*, 637 F.3d 812 (7th Cir. 2011) ................................... 20

*United States v. White*, 95 F.4th 1073 (7th Cir. 2024)............................... 19, 20

## STATUTES

13 U.S.C. § 1348............................................................................................ 22, 23

15 U.S.C. § 78j(b) ............................................................................................. 1, 21

18 U.S.C. § 371...................................................................................................... 1

18 U.S.C. § 1348(1) .............................................................................................. 1

18 U.S.C. § 3231.................................................................................................... 1

18 U.S.C. § 3731.................................................................................................... 1

## RULES

Fed. R. Crim. P. 29......................................................................................... 19, 45

Fed. R. Crim. P. 33............................................................................ 17, 20, 21, 45

## REGULATION

17 C.F.R. § 240.10b-5........................................................................................... 1

# JURISDICTIONAL STATEMENT

Defendant David Sargent was charged in an indictment, together with a co-defendant, with one count of conspiracy to commit securities fraud through insider trading, in violation of 18 U.S.C. § 371; three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5; and three counts of securities fraud, in violation of 18 U.S.C. § 1348(1). R. 1.[1]

On January 19, 2023, after a trial, the jury convicted Sargent of all six securities fraud counts, but acquitted him of the conspiracy count. R. 78.[2]

On December 20, 2023, the district court granted Sargent's motion for judgment of acquittal and, alternatively, for a new trial and entered judgment of acquittal on the district court docket. R. 111, 112.

On January 17, 2024, the government timely filed a notice of appeal from the district court's December 20, 2023, orders. R. 114.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. Jurisdiction in the Court of Appeals is provided by 18 U.S.C. § 3731.

---

[1] Citations to the Original Electronic Record on Appeal are to "R.," followed by the document number. Citations to the government's required short appendix are to "RSA.," followed by the page number. Citations to transcripts of trial proceedings before the district court, available at R. 84-96, are to "Tr.," followed by the relevant page number. Citations to the government's exhibits admitted at trial are to "G. Ex.," followed by the exhibit number; the government's exhibits that are cited in this brief can be found at R. 121.

[2] The jury acquitted defendant's co-defendant, Christopher Klundt, of all counts.

## ISSUE PRESENTED FOR REVIEW

The jury returned verdicts of guilty on six counts of securities fraud by unlawful insider trading. The district court granted judgment of acquittal, and in the alternative, a new trial, on all six counts based on a finding that, although it was "possible, even probable" that Klundt unlawfully tipped Sargent, that inference "could not be held with the certainty required for conviction," and also, "in the alternative, that the verdict is so contrary to the weight of the evidence that a new trial is required."

Did the district court misapply the applicable legal standards or abuse its discretion in setting aside the jury's verdicts?

## STATEMENT OF THE CASE

This prosecution arose from defendant David Sargent's purchase of stock and stock call options of Chegg, Inc. ("Chegg") shortly after speaking by telephone with co-defendant and Chegg insider Christopher Klundt, who had just received favorable, non-public information regarding Chegg's financial prospects during an internal Chegg Zoom meeting.

Sargent and Klundt were good friends who met in college. Tr. 306-11, 839, 854. In about 2006, Klundt started a company called StudyBlue, and asked Sargent to partner with him in the company. Tr. 835-39. The two worked together until about 2008, when Sargent left StudyBlue to enroll in law school,

Tr. 840, and eventually became licensed to practice law in the State of Illinois, Tr. 741.

In about July 2018, StudyBlue was acquired by Chegg for approximately $20.8 million. Tr. 112-14. Chegg was a publicly traded, online education company that offered products such as online study guides. Tr. 104-05. According to Klundt, as part of the sale, he received about $300,000 in addition to restricted shares of Chegg stock scheduled to vest over the course of three years. Tr. 846-51, 911. After the sale, Klundt worked for Chegg through at least the end of 2020, serving as its General Manager and then as a Vice President. Tr. 114-15. Sargent, who had left StudyBlue long before, received no money from the Chegg acquisition. Tr. 911-12.

In the late summer of 2019, Sargent began laying the foundation for a hedge fund business with a longtime friend, David Primer, whom he had known since high school. Tr. 623-24. The hedge fund business Sargent and Primer planned was aimed at algorithmic trading on stock market volatility. Tr. 623-24. It did not involve research of, or trading in, specific companies. Tr. 628. Primer had no expertise in how to research or predict the performance of specific companies. Tr. 629. Sargent and Primer did not formalize their hedge fund business until March 2021. Tr. 623-24.

***Sargent's April 2020, Communications with Klundt and Primer***

On April 20, 2020, Sargent, Klundt, and their spouses had a Zoom call. Tr. 873-74, 937. The following day, on April 21, 2020, Klundt texted Sargent, saying that it was good talking to "you guys," and adding, "I misspoke. The earnings call with Wall Street is May 4." *See* G. Ex. 60.[3]

On April 21, 2020, about an hour after receiving the text message from Klundt, Sargent, using his Vanguard Roth IRA account, placed a "limit order" to purchase 28 shares of Chegg's stock. Tr. 373-76; G. Ex. 60. A limit order allows a person to purchase stock for no more than a certain price—the limit price. Tr. 479, 495. The limit order specified that Sargent would pay no more than $35.15 per share to buy the Chegg shares. Tr. 376-77. The limit order was not filled because the market price was higher than the maximum price Sargent was willing to pay. Tr. 495-96.

---

[3] Klundt testified that he did not recall mentioning during the Zoom call an upcoming May 4, 2020, Chegg public earnings call, and also testified that he did not mention anything about a May 1, 2020, internal Chegg meeting because that was something he would never discuss. Tr. 875, 877-78. It is unclear whether Klundt knew of the scheduled May 1, 2020, internal Chegg meeting on April 20, 2020, and as noted below, Klundt later texted Sargent clarifying the date of the public earnings call, suggesting that he did in fact mention it during the April 20 call. Sargent's wife testified that she did not recall any specifics that may have been discussed during the Zoom call about Chegg or about Chegg's May 4, 2020, public earnings call. Tr. 1117.

Also on April 21, 2020,[4] Sargent called Primer to tell him of his interest in Chegg securities. Tr. 631-32. According to Primer, Sargent asked about what could be done with Chegg options. Tr. 631. Primer knew how to trade options and Sargent looked to him for advice on how to do it. *Id.* Primer testified that Sargent told him that he expected "Chegg would do well in the throes of COVID, and that information might come to light over the earnings call." Tr. 637, 654. He suggested that Sargent wait until May 1 to go long on the Chegg options because of "options decay," which means the price of options gets cheaper as you get closer to the expiration date. Tr. 658.

On April 22, 2020, Klundt received an internal Chegg email notifying him and other Chegg executives that there would be an internal Zoom meeting on Friday, May 1, 2020, at 9 a.m. PST (11 a.m. CST). Tr. 148-53.[5] The purpose of the Zoom meeting was to discuss the upcoming Chegg earnings call scheduled for the afternoon of Monday, May 4, 2020. *Id.* The Zoom invitation set forth an approximate 1 and one-half hour duration for the meeting, meaning the call was scheduled to end at 12:30 p.m. CST. G. Ex. 10.

---

[4] Primer testified that he could not recall the particular day in April that Sargent called; telephone records reflect that Primer and Sargent spoke on April 21, 2020, and had not spoken on the phone prior to that date since March 23, 2020. Tr. 758-59.
[5] Sargent's wife testified that she could not recall what was discussed during this call. Tr. 1118.

Later that day, at about 9:27 p.m., the Sargents and the Klundts had another Zoom call. Tr. 750; G. Ex. 60.

### *May 1, 2020, Internal Chegg Meeting*

As confirmed by Chegg records, Klundt participated in the Chegg internal meeting on May 1, 2020, and left that meeting at 12:53 p.m. CST. Tr. 155-57. During the meeting, Chegg's performance during the most recent quarter and trends related to future performance were discussed, including specific metrics and financial data. Tr. 157-159.

Tracey Ford, Chegg's Vice President of Investor Relations, testified that, typically, at such meetings, the attendees listen to the recording of the "script" for the public earnings call and discuss any questions the attendees may have. Tr. 157. According to Ford, a previous draft of the script noted that in the last two weeks of March subscribers had grown 119% on a year-over-year basis, but she did not recall whether that metric was discussed during the May 1, 2020, internal meeting. Tr. 143-45, 159. However, by the time of the May 4, 2020, public earnings call, the 119% metric had been deleted from the script and instead Chegg publicly stated that the subscriber growth rate for the Second Quarter was expected to be at least 45% year-over-year. Tr. 143-46.

At about 9:44 a.m. on May 1, 2020, before the Chegg internal meeting began, Primer texted Sargent asking when he would like to discuss the Chegg position. G. Ex. 66A. Sargent texted back that he would be free at about 1 p.m.

6

CST that day. *Id.* At about 12:26 p.m.—before the Chegg internal meeting had ended—Sargent called Primer and they spoke for 37 minutes. G. Ex. 60.

At 1:04 p.m. on May 1, 2020—minutes after Klundt left the meeting in which positive earnings information had been previewed for high-level Chegg employees—Klundt and Sargent had a phone call that lasted about 4 and one-half minutes. G. Ex. 60. Telephone records showed that this May 1, 2020, call was only the second time Klundt and Sargent had spoken by phone in 2020—the first call having been on January 8, 2020. Tr. 364.

### *Sargent's May 1, 2020, Purchase of Chegg Shares and Call Options*

Between about 1:41 and 1:51 p.m. on May 1, 2020—approximately 30 minutes after completing his call with Klundt, Sargent purchased 271 shares of Chegg stock in two separate transactions at just over $42 per share through a "market order" (with no ceiling price on the purchases), using his Vanguard Roth IRA retirement account. Tr. 377-79, 498-500; G. Ex. 60.[6] Sargent paid $11,415 for these shares, reducing his retirement account balance to $5.61. Tr. 381, 501-02. Given the price of the stock and the cash in the account at the time, Sargent purchased the maximum number of shares he could using his Vanguard account.

---

[6] A "market order" directs the purchase of shares at whatever price they are being traded in the market at that time. Tr. 499.

At about 1:58 and 2:40 p.m. the same day, Sargent had two short phone calls with Primer. G. Ex. 60. At trial, Primer testified that he and Sargent discussed specific quantities and strike prices of Chegg call options to purchase. Tr. 638-39.

At about 2:44 p.m., Primer used the internet to execute on Sargent's behalf the purchase of Chegg call options. Tr. 641-42; G. Ex. 60. Primer purchased for Sargent a total of 214 Chegg call options—all with a May 15, 2020, expiration date. Tr. 431-32, 642-43. Through these options, Sargent potentially controlled 21,400 Chegg shares with a market value of approximately $900,000. Tr. 533-34.

Sargent had never purchased shares of Chegg stock before May 1, 2020, and had only ever attempted to do so on April 21, 2020, when he placed a "limit order" for 28 shares. Tr. 495. Primer had never purchased Chegg options—for Sargent or himself—before May 1, 2020. Tr. 631.

Forty-eight of the 214 options Sargent purchased had a strike price of $40; 166 of them had a strike price of $50. Tr. 432-34. When Primer made these purchases on May 1, 2020, Chegg's stock was trading at a little more than $42 per share. Tr. 520-21, 755. From 2015 through May 1, 2020, the price of Chegg shares had never reached $50 per share. Tr. 521-22.

With Primer's assistance, Sargent made the May 1, 2020, purchase of 214 Chegg call options through Sargent's brokerage account at TradeStation.

Tr. 641-43. The options cost Sargent a little less than $30,000. Tr. 434, 768. At the time of the purchase, Sargent had only $21,926.50 cash in the account—nearly $8,000 less than the Chegg options' purchase price. Tr. 434-35. As a result, TradeStation essentially loaned Sargent the remaining amount due on margin to fund the balance of the purchase of the Chegg call options. Tr. 435-38.

The total cost of the Chegg shares and call options Sargent purchased on May 1, 2020, was approximately $41,181. G. Ex. 63. Tax returns for Sargent and his wife show that their adjusted gross income was $93,108 for 2018, and $112,968 for 2019. Tr. 311-14, 337-39. Thus, in a single day, Sargent used a substantial portion of his and his wife's adjusted gross income for the past two years to purchase Chegg securities.

According to Kevin Barrett, the government's expert, in order for Sargent's options position to be profitable, there would need to be a "sudden and significant jolt or spike upward in price." Tr. 546. He opined that, given that there was only a two-week window between Sargent's purchase of the options and their expiration, that jolt could only be driven by a "specific company-driven type of an event"—such as the release of favorable information regarding the company's earnings and projected earnings during that period. *Id.*

***Chegg's May 4, 2020, Public Earnings Call and Sargent's Sale of Chegg Stock***

Chegg's public earnings call was held on the afternoon of Monday, May 4, 2020. Tr. 160. Sargent and Primer both listened to the call and exchanged texts as it happened. Tr. 646-47. At about 3:52 or 3:53 p.m., during the earnings call, Primer sent Sargent a text noting, "They didn't bring up the 200% figure . . . They said 45% growth in Q2. If you're right, that's a conservative estimate." Tr. 650. Primer explained that Sargent had told him in a previous call that he thought "online engagement" with Chegg would be at or around 200% because of COVID. *Id.* Primer did not recall where Sargent got that figure. *Id.*[7]

Chegg issued a press release shortly after the earnings call. Tr. 160-61. The First Quarter results and Second Quarter guidance Chegg announced were positive and beyond Chegg's original expectations. Tr. 129-30. According to Ford, before the earnings call and press release, there had been uncertainty and "angst" within Chegg about how COVID would impact the company's

---

[7] As noted above, Ford testified that, during the May 1, 2020, internal meeting, Chegg disclosed to its executives that subscriber growth was expected to be at least 45%, not that it had recently increased by 119%, as reflected in a draft "script" for the May 4, 2020, public earnings call. Ford's testimony regarding the 119% figure does not match references by Sargent and Primer to a 200% figure—and the trial testimony did not shed light on whether the mismatch was the result of Ford, Sargent, and Primer talking about different metrics, or of Sargent having misheard or misremembered a metric that Klundt shared with him. Nevertheless, Primer's testimony established that Sargent had been expecting to hear a different—and higher—number during the call.

business, Tr. 136-37, and Wall Street analysts had a negative sentiment about Chegg's performance, Tr. 131-32.

Hours after the May 4, 2020, earnings call, Klundt texted Sargent the following emoji with no accompanying explanation:



G. Ex. 8. Sargent texted back: "Congratulations on a great quarter! The analysts are swooning." Tr. 756.

At the close of trading on May 4, 2020, Chegg's stock price was $43.79. Tr. 755. The following day, the price of the company's stock hit unprecedented heights, reaching an opening price of $53.60, and a high of $61.33. Tr. 549-51. Chegg's trading volume also dramatically increased, reaching 38,518,000 shares—about 36 million more than the volume traded on May 1. Tr. 549-50. Government expert Barrett opined that the increases in price and volume demonstrated that the market was completely taken by surprise by Chegg's earnings release. Tr. 550-51.

On May 5, 2020, at Sargent's direction, Primer sold all of the Chegg options Sargent had purchased on May 1, 2020. Tr. 652-53. The sale netted Sargent a profit of about $103,000—a return of almost 350% in four days. Tr. 756-57.

On June 19, 2020, Sargent sold the Chegg shares he had purchased through his Vanguard account on May 1, 2020, and made an additional profit of about $7,000. Tr. 757.

### Klundt's Concealment and Trial Testimony

Several months later, in September 2020, FINRA sent a letter to Chegg asking it to circulate to company insiders a five-page list of persons and entities who had traded in Chegg's securities at around the time of the earnings call. Tr. 713-17. The list included Sargent's name and city of residence. Tr. 717. Chegg circulated the questionnaire to its insiders, including Klundt. Tr. 197-99. G. Ex. 19. Klundt responded, stating, "I do not recognize any individual or entity on the FINRA list, nor do I have any investments or funds under management with any entity on the list." Tr. 717-20; G. Ex. 20.[8]

Klundt testified at trial that he understood the prohibition against insider trading. Tr. 921-27. Klundt denied knowing information about Chegg's First Quarter financial performance prior to May 1, 2020, and denied knowing that Sargent was trading Chegg stock. Tr. 878-80. He testified that the first

---

[8] This language mirrored language found on page 9 of the 16-page attachment to the email Klundt received. G. Ex. 19. Here is the relevant excerpt from that page:

If you answered **NO** to all of the above questions, you may **STOP** here. Please send an email to dana@chegg.com and vbarredo@fenwick.com stating that you do not recognize any individual or entity on the FINRA list, nor do you have any investments or funds under management with any entity on the list.

time he ever learned that Sargent traded Chegg stock was when the government told him about it in January or February 2021. Tr. 880-81.

As for the April 21, 2020, text he sent to Sargent correcting the date he had given Sargent for the earnings call, Klundt testified that he had never before sent Sargent a text about an upcoming earnings call. Tr. 940. He also testified that the May 1, 2020, internal Chegg meeting was the first one he could recall having participated in. Tr. 941-42. Regarding the telephone call he had with Sargent shortly after that internal Chegg meeting, Klundt testified that, while he does not recall what he and Sargent discussed, he did not tell Sargent anything about the May 1 meeting or about Chegg's financial performance because he "would never do that." Tr. 882-83. Klundt also testified that, as far as he knew, Sargent did not work in the online education industry after he left StudyBlue in 2007 or 2008—in other words, it was unlikely that Sargent had sufficient knowledge of this industry to understand and appreciate trends and predict Chegg's performance.

Klundt testified that the emoji with dollar signs he sent to Sargent the evening of May 4, 2020, was meant to express excitement about how the favorable earnings information affected him and his family, not how it might affect Sargent. Tr. 887. He acknowledged, however, that he had never before sent Sargent a text after a positive Chegg earnings call and had never before sent an emoji like the one he sent Sargent. Tr. 954-55. He also acknowledged

that he did not send any of his other friends a similar emoji concerning the May 4, 2020, earnings call. Tr. 956.

Regarding the email he sent to Chegg in late September 2020 denying that he recognized any of the names on the FINRA list, Klundt testified that he was "careless" in reading the email and did not carefully review every page. Tr. 889-900. He said that he looked only for people with whom he had investments, such as Steve Wallman (whom Klundt called as a character witness) and did not see Sargent's name on the list. *Id.*

### The District Court's Ruling

Following the jury's verdict, Sargent filed post-trial motions challenging, among other things, the sufficiency of the government's evidence and seeking judgment of acquittal and, in the alternative, a new trial. R. 101. In his motion, Sargent principally contended that the evidence was insufficient to convict him. R. 101 at 16-29, and also raised other arguments, including (1) that the district court erred by admitting Klundt's out-of-court statements as co-conspirator statements; (2) that there was an irreconcilable inconsistency in the jury's acquittal of Klundt but conviction of Sargent; (3) that venue was improper; and (4) that the government made inappropriate comments regarding Sargent's failure to testify. *Id.* at 13-16, 30-40.

On December 19 and 20, 2023, after briefing by the parties, R. 101, 105, 108, the district court entered a judgment of acquittal and, in the alternative,

a new trial, and delivered an oral ruling explaining its decision. R. 111, 112, 113; RSA 3-11. The court rejected most of Sargent's claims, including those related to hearsay, venue, inconsistency of the verdicts, and alleged government misconduct. RSA 8-9. But the court determined that this is "the rare and unusual case that fell short of the necessary inference[s]" to find guilt "beyond a reasonable doubt." RSA 8. Although the court acknowledged that a conviction may be secured through circumstantial evidence, that the evidence must be viewed in the light most favorable to the verdict, and that, in the court's view, the "jury was properly instructed and the evidence before it was properly admitted," RSA 8, it found that there was insufficient evidence to conclude, beyond a reasonable doubt, that Klundt disclosed material, non-public information to Sargent with knowledge that Sargent would trade on it, RSA 8.

The court viewed the May 1 telephone call between Klundt and Sargent as the only time such information could have been conveyed. RSA 5. The court acknowledged that "[t]here is suspicious evidence surrounding the phone call," RSA 6, and viewed it as "probable" Klundt tipped off Sargent, RSA 7, and "more likely than not that both Mr. Klundt and Mr. Sargent engaged in insider trading," RSA 9-10. The court referenced the Klundts' conversations with the Sargents, including Klundt's alerting Sargent to the date of the earning announcement; Sargent's expression to Primer of specific confidence in Chegg's

online customer engagement; the fact that Klundt sent Sargent an "unusual text message" following the earnings call—a message he did not text to anyone else; the fact that Sargent responded by congratulating Klundt on the quarter, which confirmed that the emoji was meant to reference the value of Chegg stock; and the fact that Sargent had previously placed a limit order in April for Chegg stocks that reflected less confidence in Chegg's prospects than the purchases he made on May 1. RSA 6. The court also suggested that various factors identified by the First Circuit to guide consideration of insider cases were "helpful" and each of those factors supported the jury's verdict. RSA 7-8 (discussing *United States v. Chan*, 981 F.3d 39 (1st Cir. 2020)). But the court found that facts in *Chan* were "weightier" in that, in that case, "[t]here were mutual trades, money passing between the two defendants, and the concealment was more nefarious" and that, in this case, "[t]here was no concealment" by Sargent. RSA 8. And it found that the evidence, while suspicious, did not meet the standard required to support a criminal conviction.

The court reasoned that Sargent's "bullishness" about Chegg's performance "could come from so many different types of information, including public or immaterial information about Chegg and the economy during the pandemic, that a jury would have to guess that Klundt disclosed material, inside information." RSA 6. And regarding Klundt's concealment

from FINRA his relationship with Sargent, the court contended that it was "not probative of Klundt's knowledge on May 1st, that Sargent was going to trade based on inside information." RSA 6-7. The court asserted that the record lacked evidence showing that Klundt was "aware of Sargent's trading practices," that Sargent's trading "was some mutually shared topic," or that Klundt "kn[ew] of Sargent's plan to trade." RSA 7. Finally, because the court determined that "the evidence in the light most favorable to the government cannot sustain a conviction" the court also found, "in the alternative, that the verdict is so contrary to the weight of the evidence that a new trial is required" under Rule 33. RSA 9.

## SUMMARY OF ARGUMENT

The district court erred in granting defendant's motions for judgment of acquittal and, alternatively, for a new trial. Contrary to the court's determination, viewing the evidence in the light most favorable to the government, the evidence was sufficient to permit a reasonable jury to find all of the elements of the charged offenses beyond a reasonable doubt.

The evidence established that Sargent had a close friendship with co-defendant Christopher Klundt, who was a Vice President at Chegg, Inc. A text message from April 21, 2020, showed that, the day before, Klundt and Sargent had discussed Chegg's upcoming May 4 earnings call, and that Klundt was aware that Sargent was interested in the timing of that scheduled earnings

17

call. The undisputed evidence showed that on the morning of Friday, May 1, 2020, Klundt learned material, non-public information during an internal Chegg, Inc. Zoom meeting—specifically, that on Monday, May 4, 2020, Chegg, Inc. was going to publicly announce its strong First-Quarter earnings and its expected strong Second-Quarter earnings. Klundt and Sargent spoke by telephone about 11 minutes after the conclusion of the internal Chegg meeting, Sargent and Klundt had a 4 and one-half minute phone call—only their second phone call in 2020—and beginning within 45 minutes of that call, Sargent made extremely and uncharacteristically large purchases of Chegg securities, cleaning out his 401(k) account and effectively borrowing from his trading account to do it.

After the earnings information was publicly disclosed, Klundt texted Sargent—and only Sargent—a "money-mouth" emoji, and later lied about knowing Sargent when questioned in connection with a FINRA investigation of trades made near the time of Chegg's May 4, 2020, public earnings call. The jury could—and did—reasonably infer from this and other evidence that Klundt tipped Sargent to material, non-public information regarding Chegg's unexpectedly favorable earnings—and that he did so knowing that Sargent would trade on it. The district court erred in concluding otherwise, and on that basis, setting aside the jury's verdict.

# ARGUMENT

## The District Court Erred in Granting Defendant's Motions for Judgment of Acquittal and for a New Trial.

### A. Standard of Review

This Court reviews *de novo* a district court's determination of a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. *E.g.*, *United States v. White*, 95 F.4th 1073, 1078 (7th Cir. 2024); *United States v. Filer*, 56 F.4th 421, 425 (7th Cir. 2022).

Where the motion is based on the sufficiency of the evidence, the standard for granting the motion—and for upholding a district court's determination of the issue—is highly deferential of the jury's verdict. *E.g.*, *White*, 95 F.4th at 1078 (citations and internal quotation marks omitted). Under this standard, a court may overturn a conviction only if it finds that "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Griffin*, 76 F.4th 724, 741-42 (7th Cir. 2023) (internal citations and quotation marks omitted); *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (citation and quotation marks omitted). Put another way, the jury's verdict must stand if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bard*, 73 F.4th 464, 479 (7th Cir.

2023) (citation omitted), *reh'g denied sub nom. United States v. McClure*, No. 21-2689, 2023 WL 6051011 (7th Cir. Sept. 15, 2023); *Filer*, 56 F.4th at 425.

In making this determination, the Court views the evidence presented at trial "in the light most favorable to the government," and draws all reasonable inferences in the government's favor. *See*, *e.g.*, *White*, 95 F.4th at 1078 (citations and internal quotation marks omitted); *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016). The court affords great deference to the jury's deliberations, respecting that it is "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Godinez*, 7 F.4th 628, 638–39 (7th Cir. 2021) (internal citations and quotation marks omitted). *See also*, *e.g.*, *United States v. Griffin*, 76 F.4th 724, 741-42 (7th Cir. 2023) (internal citations and quotation marks omitted); *United States v. Brown*, 973 F.3d 667, 681 (7th Cir. 2020). Courts "do not re-weigh the evidence or second-guess the jury's credibility determinations." *United States v. Taylor*, 637 F.3d 812, 815 (7th Cir. 2011). As this Court emphasized in *United States v. Jones*, the relevant inquiry does not ask what the Court would have decided if it were on the jury and does not require that the Court itself be convinced by the evidence. 713 F.3d 336, 340 (7th Cir. 2013) (citation omitted).

This court reviews a district court's determination of a motion for a new trial under Fed. R. Crim. P. 33 for an abuse of discretion, giving deference to

the district's court's determination. *United States v. Rivera*, 901 F.3d 896, 903 (7th Cir. 2018). Although such a motion may be granted based on the district court's assessment of the evidence, a "new trial should be granted only if the evidence preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citations omitted). *See also United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (stating that "the exercise of power conferred by Rule 33 is reserved for only the most extreme cases.") (citation omitted); *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly").

## B.   Analysis

### 1.   The Evidence Was Sufficient to Allow a Rational Jury to Find Sargent Guilty of the Securities Fraud Counts Beyond a Reasonable Doubt.

#### a.   The Elements of the Offenses of Conviction

As the district court instructed the jury, in order to prove insider trading under 15 U.S.C. § 78j(b), the government was required to establish: (1) that in connection with the purchase or sale of a security, the defendant committed "insider trading" with the intent to defraud; (2) the defendant acted willfully; and (3) the defendant knowingly used, or caused to be used, the Internet, which

is a means and instrumentality of interstate commerce, in furtherance of the fraudulent conduct.

The district court instructed the jury that in order to prove insider trading under 13 U.S.C. § 1348, the government needed to establish: (1) there was a scheme to defraud, specifically, "insider trading," as charged in the indictment; (2) the defendant knowingly executed the scheme; (3) the defendant acted with the intent to defraud; and (4) the scheme was in connection with any security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934. R. 80 at 21-22.

The court defined the term "insider trading" for the jury as follows:

"Insider trading" requires proof beyond a reasonable doubt that:

1. A corporate insider, or tipper, obtained material, non-public information under a duty of trust and confidence to keep that information confidential. Information is "material" if there is a substantial likelihood that a reasonable investor would have considered it significant in deciding whether to purchase or sell securities. Information is non-public if it is not available to the public through sources such as press releases, Securities and Exchange Commission filings, analyst reports, magazines, newspapers, television, radio, websites, Internet chat rooms, or online message boards. To constitute non-public information, information must be specific and more private than general rumor; and

2. In violation of that duty of trust and confidence, the insider disclosed the material, non-public information to an individual, or tippee, so that the tippee could trade using the information; and

3. The tipper personally benefitted in some way, directly or indirectly, from the disclosure of the material, non-public information; and

4. The tippee received the material, non-public information and knew that the information had been disclosed in violation of a duty of trust and confidence; and

5. The tippee knew that the tipper personally benefitted in some way, directly or indirectly, from the disclosure of the material, non-public information; and

6. The tippee used the material, non-public information to purchase securities using a means and instrumentality of interstate commerce, in this case, the Internet.

R. 80 at 24.[9]

### b. The Evidence Supported the Inference that Klundt Unlawfully Tipped Material, Non-Public Information to Sargent and that Sargent Traded on That Information.

The evidence presented to jury included strong circumstantial evidence from which a rational jury could find beyond a reasonable doubt that Klundt tipped Sargent about material, non-public information concerning Chegg's recent and expected earnings. The evidence established that Sargent and Klundt had discussed Chegg's upcoming earnings call in late April; that

---

[9] These instructions confined securities fraud under § 1348 to insider trading and defined "willfully" to require that the defendant knew his conduct was "against the law," as opposed to "wrongful," over the government's objection. The government is not challenging any of the court's instructions on appeal.

Sargent placed an initial limit order of Chegg stocks prior to Klundt's receipt of favorable, non-public information, which indicated a lack of confidence in the securities; that Klundt and Sargent had a brief telephone conversation directly following an internal Chegg call at which positive material and non-public information about Chegg's performance was disclosed; that the call was followed within two hours by Sargent's purchase of a significant quantity of Chegg stocks and risky options; that Sargent emptied his entire retirement savings account to purchase the stocks, emptied his TradeStation account (and effectively borrowed even more from TradeStation) to purchase the options, and spent in total an amount that represented a significant portion of the Sargents' gross income; that Klundt and Sargent communicated following the May 4 earnings call in a way that suggested Klundt's consciousness of Sargent's likely return; and that Klundt falsely responded to FINRA's inquiry, which suggested an attempt to conceal his relationship with Sargent.

Details regarding Sargent's purchase of the Chegg securities provided substantial support for the conclusion that Sargent made these purchases based on favorable material, non-public information provided to him by Klundt, rather than based on generally available information concerning Chegg's business and the pandemic. The extremely aggressive nature of the purchases, which stood in stark contrast with Sargent's timid "limit" order placed ten days earlier, the extent of the personal resources Sargent devoted

to the purchases, despite the lack of any evidence that he or his friend, Primer, had done any investigation of Chegg's prospects, and the risky nature of the position taken by Sargent in light of both the then-current value of the stock and the short expiration period of the options—all demonstrated a degree of confidence in Chegg that strongly suggested that Sargent possessed material information that had not yet been—but soon would be—made public.

Moreover, the evidence indicated that generally available information could not justify Sargent's aggressive—and uncharacteristic—purchases. Chegg's Vice President for Investor Relations testified that, prior to the First-Quarter earnings and Second-Quarter projections, there was considerable uncertainty about the company's prospects in light of the pandemic. Tr. 129-31. Moreover, Klundt himself testified that the positive news he learned on May 1, 2020, came as a relief to him, given the uncertainty surrounding Chegg's financial prospects. Tr. 878, 886, 919-21, 944-47. Finally, as explained by the government's expert, the sudden increase in the stock's price following the May 4, 2020, demonstrated that the market as a whole was caught off guard by Chegg's success, Tr. 549-50, and that fact provided further support for the inference that Sargent acted on the inside information provided to him by Klundt, rather than on general information available to the market before the earnings announcement.

### c. The Evidence Showed That Klundt Expected that Sargent Would Trade on the Insider Information He Disclosed.

Although there was no recording of Klundt's call with Sargent immediately following the Chegg insider meeting, the circumstantial evidence strongly supported the inference that Klundt disclosed material, non-public information, knowing or intending that Sargent would trade on it. Klundt's April 21 text message alerting Sargent to the May 4 earnings call, his repeated communications with Sargent on and around the May 1 internal meeting, and his unsolicited text message sending a dollar-sign emoji following the May 4 earnings call (which reasonably could be construed as congratulatory to Sargent), support such an inference. Klundt's failure to acknowledge his relationship with Sargent, despite the men's close friendship and their undisputed communications before and after the May 4 earnings call, also strongly supports that inference.

More specifically, the evidence showed that Klundt knew Sargent was interested in trading in Chegg securities. Klundt's April 21, 2020, text to Sargent correcting the date he previously had given for the Chegg public earnings call showed that: (1) they already had spoken about the earnings call, and (2) Klundt considered that date sufficiently important to Sargent to warrant correction. And, although Klundt testified that he did not recall

mentioning the May 4 earnings call in the Zoom call on April 20, his text demonstrates that the issue was in fact discussed.

In addition, the evidence established that, at the time of the couples' April 22 Zoom call, Klundt was aware he would be attending an internal meeting on May 1 scheduled to take place between 11:00 a.m. and 12:30 p.m. CST, at which time he would learn material, non-public information about the company's performance. Tr. 941; G. Ex. 60. Sargent's text to Primer on the morning of May 1 indicating that he would be available to speak with Primer at 1:00 p.m. provided the jury with a basis to infer that Klundt had informed Sargent of the scheduled internal meeting. That inference was not undermined by evidence showing that Sargent unsuccessfully reached out to Klundt at about 11:55 a.m., Tr. 778-79; to the contrary, a rational jury could infer from that call that Sargent was anxious to receive information disclosed during the meeting.

Klundt's text of the emoji to Sargent a few hours after the May 4 earnings announcement, which is reasonably understood as an expression of congratulations to Sargent regarding the money he expected Sargent had made trading on the information received from Klundt, rather than as a boast about Klundt's own success, *see* Tr. 887, 952-56, provided further evidence supporting the inference that Klundt was aware of Sargent's intent to trade on the information he received from Klundt—particularly in light of Klundt's April 21

text about the May 4 earnings call, the two men's May 1 call immediately after the internal Chegg meeting (which was only the second of two phone calls they shared that year), and the fact that Klundt did not send the emoji to any of his other friends and had not sent that particular emoji to anyone before. *See* Tr. 955-56. And the fact that Klundt sent the emoji text without any explanation indicates that Klundt expected Sargent to understand what it meant. In the context of the evidence as a whole, the jury could rationally reject Klundt's explanation—that the emoji merely celebrated his own success— particularly given that Sargent was the one friend he had who had missed out on this and other paydays by leaving StudyBlue years before.

Likewise, the jury could reasonably view as additional proof Klundt's weak attempt to explain away his failure to acknowledge his relationship with Sargent in response to the FINRA inquiry as a careless mistake, given all the circumstances, including the importance of the inquiry, which was stressed by Chegg's counsel. *See* Tr. 971-73. Klundt's efforts to conceal provided strong evidence of consciousness of guilt, and—particularly when coupled with all of the other suspicious circumstances—provided another basis for the jury to have "infer[red]" beyond a reasonable doubt that the content of Sargent and Klundt's May 1 call included the disclosure of material, non-public information regarding Chegg. *See Carpenter v. United States*, 484 U.S. 19, 23 (1987) ("steps to conceal" trades supported insider trading conviction); *United States v.*

*Larrabee*, 240 F.3d 18, 23 (1st Cir. 2001) (finding "significant" efforts of tipper and tippee "to conceal their relationship"); *Chan*, 981 F.3d at 58-60 (false denials in FBI interview helped allow a "reasonable jury to conclude" the defendant was "guilty beyond a reasonable doubt of securities fraud"); *see also, generally, United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975) ("It is well settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt.").

In sum, viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences in the government's favor, a rational jury clearly could have found Sargent engaged in insider trading.

## 2. The District Court Improperly Substituted Its Own Judgment for that of the Jury.

The district court erred in overturning the jury's verdict. It improperly set aside the jury's determination that Klundt passed material, non-public information about Chegg to Sargent during their May 1, 2020, phone call, and that Klundt did that so Sargent could trade on the information.

### a. The district court's analysis failed to account for important evidence relating to the May 1, 2020, phone call.

The district court stated that the tip from Klundt to Sargent would have had to have taken place during the 4 and one-half minute phone call between Klundt and Sargent on May 1, 2020, shortly after the Chegg internal meeting.

RSA 5. The court concluded that "it is possible, even probable that Klundt tipped Sargent" during that call. *Id.* at 7. But the court went on: "It is not an inference that can be held with the certainty required for conviction" because while "[t]he upcoming earnings call was on both of their minds . . . nothing in the record suggested that Sargent trading in Chegg around the time of the earnings call was some mutually shared topic." *Id.*

The district court's assessment unreasonably discounts, and fails to account for, important evidence presented at trial. Numerous pieces of direct evidence showed that (1) Klundt and Sargent had discussed Chegg's May 4 public earnings call even before the May 1 internal meeting; (2) Klundt was in possession of material, non-public information about Chegg on May 1; (3) Klundt and Sargent communicated shortly after Klundt came into possession of the information; and (4) soon thereafter Sargent aggressively traded in Chegg stocks and options. All of this evidence allowed a reasonable jury to conclude—contrary to the district court's assessment—that "Sargent trading in Chegg around the time of the earnings call was some mutually shared topic." RSA 7.

The district court stated that "[w]hen a chain of inferences is necessary to establish a fact, each link in the chain must be 'sufficiently strong' to avoid speculation." RSA 4-5 (citing *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013)). In so doing, the district court suggested that the evidence laid out above

merely represented a chain of inferences, each one tenuously building on the other, before reaching a final, factual conclusion: that Klundt gave material, non-public information to Sargent on May 1, 2020. This, however, is not such a case.

*United States v. Jones* concerned a defendant convicted of illegally possessing cocaine and using a phone to facilitate the possession. There was no direct evidence that defendant Jones possessed cocaine, and the intercepted calls, some of which involved Jones, were not tied directly to cocaine possession. This Court noted that "[e]ntirely circumstantial cases are not unusual, of course, and they certainly can provide constitutionally sufficient proof beyond a reasonable doubt." *Jones*, 713 F.3d at 340. However, the circumstantial evidence in *Jones* fell short because it depended on a chain of inferences piled on top of one another and appeared to be driven by Jones's mere association with criminals. *Id.* at 347.

Whatever the merits of the inferential chain in *Jones*, this case presents a starkly different situation. Here, the jury here was asked to infer that, during their May 1, 2020, call, Klundt, in fact, gave Sargent material, non-public information about Chegg, based on numerous items of evidence—some direct, other circumstantial—and not on a lengthy chain of otherwise unsupported inferences.

The district court discounted the value of evidence of Sargent's sudden bullishness about Chegg by speculating that it could have "come from so many different types of information, including public or immaterial information about Chegg and the economy during the pandemic." RSA 6. As discussed above, the evidence presented at trial permitted the jury to infer that Sargent's sudden confidence was due to a disclosure of material, non-public information by Klundt, rather than to generalized, publicly-available information.

Primer referenced a 200% subscriber increase figure that Sargent allegedly told him (which the jury could conclude was a reference to non-public information Klundt learned internally at Chegg) but could not recall where that figure came from. Primer also indicated he did not conduct any research on Chegg, could not recall Sargent telling him he had read any of Chegg's fundamentals or earnings documentation, and that the men did not have a general COVID-positive trading strategy at that time. *See* Tr. 640-641, 702.

Sargent's own options-trading expert testified that options trading around the time of earnings announcements usually involved significant research across a variety of factors and metrics, and that he was unaware of Sargent conducting any. Tr. 1162-1164. Although defense counsel introduced or referenced some articles suggesting possible long-term growth opportunities for Chegg, the evidence established that Sargent actually reviewed at most one of those articles before investing in Chegg; that the articles were far from

categorically positive; and that they focused mostly on long-term, rather than short-term growth potential. Consistent with that testimony, the government's expert testified that the trading volume and spike in price on May 5 suggested the market was taken by surprise by the announcement. Tr. 550-551. This evidence, together with Sargent's decision to bet the entirety of his Roth IRA and brokerage account on a company in which he had never previously invested—and to purchase the riskiest out-of-the money options—all supported the conclusion that Sargent's purchases were based on inside information rather than isolated publications or other publicly-available information. The district court's contrary conclusion substituted the court's judgment for the jury's and reflected a failure to view the evidence in the light most favorable to the verdict.

Contrary to the district court's suggestion, the timing of the events on May 1 provided a strong basis for the jury to infer that Klundt passed inside information to Sargent. May 1 was the Friday before the Monday afternoon earnings call, and it was Primer who initiated the text communication with Sargent that morning offering to discuss the Chegg position to take. G. Ex. 66A. Rather than speaking with Primer at that time, Sargent texted him to say that he would be free to speak at about 1:00 p.m., which turns out to be almost precisely the time that Chegg's internal meeting ended. G. Ex. 66A, G. Ex. 60. Telephone records show that Sargent and Klundt spoke on the phone

for 4 and one-half minutes, beginning at 1:04 p.m. G. Ex. 60. A little more than 30 minutes after his call with Klundt ended—and without having spoken to Primer following his call with Klundt—Sargent purchased the 271 shares of Chegg stock with a market order when the price was about $42 per share, which price was about $7 per share more than he was willing to pay for Chegg stock shares about 10 days earlier. G. Ex. 60. The increase in Chegg's share price between April 21 and May 1 represented roughly about a 20% increase in Chegg's price; yet Sargent suddenly was willing to buy the company's shares with a market order. The jury rationally could conclude that Sargent's more aggressive position with respect to Chegg shares on May 1 was a function of information he received from Klundt less than one hour earlier.

The evidence showed that after Sargent purchased the 271 shares of Chegg stock, he then had two telephone conversations with Primer—one at 1:58 p.m. and one at 2:40 p.m. G. Ex. 60. Then at 2:44 p.m., he purchased the Chegg call options that were expiring in two weeks, G. Ex. 60, and many of which were deeply out-of-the-money and required a sudden jolt in the stock price to make the position profitable. Sargent's sudden willingness—only after he had spoken to Klundt—to make these purchases, demonstrated that he had gained a level of confidence after 1:04 p.m. that he did not have before his call with Klundt. Finally, the district court improperly discounted the probative value of Klundt's concealment from FINRA, finding that it was not probative

of the contents of the May 1 call because the concealment occurred more than 4 months later. RSA 6-7. As discussed above, concealment provides powerful evidence of consciousness of guilt. Here, Klundt's guilt rested on his disclosure of material insider information to Sargent with knowledge or intent Sargent trade on it; evidence showing Klundt's consciousness of guilt supported an inference that Klundt actually engaged in such conduct. *See United States v. Harmon*, 721 F.3d 877, 882 (7th Cir. 2013) (explaining that consciousness of guilt raises an inference of actual guilt).

### b. The district court undervalued the evidence of Klundt's intent.

Consistent with the jury instructions, in its post-trial ruling, the district court noted that the government was required to show Klundt's intent, *i.e.*, that Klundt gave the material, non-public information so Sargent could trade on it. On this aspect, the district court concluded that "the record is bereft of evidence . . . of Klundt's knowledge of Sargent's plan to trade" and that "[t]he emoji from Klundt is not enough to prove beyond a reasonable doubt that Klundt knew Sargent was trading on Chegg." RSA 7.

The district court erred in determining that the emoji was not highly probative of Klundt's knowledge of Sargent's intent to trade. Klundt testified that the emoji reflected his own financial success, and both he and Sargent advanced this argument during their closings. Tr. 887, 1306-07, 1351-53. As

discussed above, the jury rationally could reject this argument, in light of the evidence as a whole. As the government maintained during closing, the emoji from Klundt was unsolicited, was sent with no explanation, and was not in response to a prior text message. Tr. 1273-74; G. Ex. 8. Yet Sargent's response showed that Sargent knew that Klundt's emoji referred to the Chegg earnings call from a few hours earlier. In other words, the emoji, in combination with Sargent's response, show that Klundt knew Sargent would be listening to the call and would understand Chegg's positive announcement would result in a large increase in Chegg's stock price. Tr. 1274. In addition, Sargent's response to the emoji separately showed that Sargent knew what Klundt was conveying with the emoji and that his understanding shows they had discussed the topic in advance. Tr. 1274.

The jury could rationally decide that Klundt was unlikely to have sent this emoji to Sargent to boast about his own financial success as a result of the earnings call for multiple reasons, including because much of Klundt's equity in Chegg was in the form of Chegg stock that had not yet vested and might not be worth as much by the time those shares became vested. Tr. 1274-76. And Klundt did not send texts about the Chegg earnings call to anyone other than Sargent. Tr. 1275-76.

The district court also failed to take into account evidence showing that Klundt and Sargent specifically had discussed the upcoming earnings call. *See*

G. Ex. 60; G. Ex. 8 (text message from Klundt to Sargent relaying date of earnings call). That evidence supported a reasonable inference that Sargent had expressed interest in trading around the time of the earnings call and that Klundt—as a participant in that exchange—necessarily understood that to be Sargent's interest. To be sure, some other inference could have been drawn about why Klundt and Sargent discussed the upcoming earnings call and/or why Sargent was interested in Chegg's May 4th earnings call. But no such alternative theories appeared in the record, and in convicting Sargent, the jury clearly did not find that Klundt had no knowledge of Sargent's intent. Moreover, the jury's inference from the text message—that Klundt shared the date of Chegg's earnings call with Sargent because he knew Sargent was interested in trading Chegg securities—was reasonable in light of other trial evidence presented. As explained earlier, that evidence showed that on April 21, 2020, about an hour after getting the text message from Klundt with the correct date of the Chegg earnings call, Sargent placed a limit order to purchase 28 shares of Chegg's stock. Tr. 373-76.

The district court also failed to credit the evidence that Klundt lied to FINRA. As discussed above, this evidence negated the possibility that Klundt gave material, non-public information to Sargent by accident, and to show that he knowingly disclosed insider information to Sargent with an illegal purpose.

The jury necessarily considered Klundt's intent after having found that Klundt gave Sargent material, non-public information. The evidence showed that Klundt received several warnings from Chegg about the impropriety and potential illegality of disclosing material, non-public information. These warnings, together with the other evidence, provided a rational basis for a jury to conclude that Klundt would not have undertaken these risks without a purpose for Sargent to profit from the information.

In granting Sargent's post-trial motion, the district court impermissibly spliced and diced the evidence—focusing on individual pieces of evidence rather than reviewing the evidence as a whole. *See United States v. Klein*, 913 F.3d 73, 78-79 (2nd Cir. 2019) (explaining, in a securities fraud case, that "it is essential to view the various pieces of evidence together"); *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself."). The issue wasn't whether the emoji, by itself, proved Klundt's state of mind beyond a reasonable doubt. The proper approach was to consider whether the emoji, in conjunction with the defendants' friendship, the April 21 text message, the May 1 phone call, the nature of Sargent's trades, and the fact that Klundt was repeatedly warned about the illegality of insider trading, supported the jury's finding that Klundt

passed material, non-public information to Sargent so that Sargent could trade on it.[10]

In the criminal context, inferring the mental state of a defendant is the regular work of juries. For example, in the analogous context of schemes to defraud, the Seventh Circuit has explained that "[d]irect evidence of an intent to defraud is rare" and such intent "is typically shown by circumstantial evidence and inferences drawn from the scheme itself." *See United States v. Filer*, 56 F.4th 421, 435 (7th Cir. 2022) (quotations and citation omitted). The Supreme Court has similarly emphasized that the fact-finder can infer a defendant's mental state based on odd or suspicious circumstances. *See Ruan v. United States*, 597 U.S. 450, 467 (2022) ("The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence" such as how odd or unreasonable was the defendant's conduct); *Rehaif v. United States*, 588 U.S. 225, 139 S. Ct. 2191, 2198 (2019) (similar); *Liparota v. United States*, 471 U.S. 419, 434 (1985) ("Rather, as in any other criminal prosecution requiring mens rea, the Government may prove by reference to

---

[10] The district court also failed to take account of the jury's apparent assessment of Klundt's credibility. For the jury to have convicted Sargent, it had to have found that Klundt passed inside information to Sargent knowing that Sargent would trade on it. Since Klundt testified that he did not recall his May 1 telephone conversation with Sargent, but in any event would not have passed inside information to Sargent, one must infer that the jury did not find Klundt to be credible—otherwise it would have had to acquit Sargent.

facts and circumstances surrounding the case that petitioner knew that his conduct was unauthorized or illegal"). The district court's decision to reject the jury's work in this case pays insufficient heed to this precedent.

c. **The district court erred in determining that the evidence in this case was insufficient relative to the evidence presented in other securities fraud cases.**

The district court compared this case unfavorably with the First Circuit's decision in *United States v. Chan*, 981 F.3d 39 (1st Cir. 2020). RSA 7-8. In *Chan*, the appeals court repeated the six-factor test it uses to assess the sufficiency of evidence in insider trading cases, where a lack of direct evidence establishing the disclosure of inside information is not uncommon. Those factors are: "(1) access to information; (2) relationship between the tipper and the tippee; (3) timing of contact between the tipper and the tippee; (4) timing of the trades; (5) pattern of the trades; and (6) attempts to conceal either the trades or the relationship between the tipper and the tippee." *Chan*, 981 F.3d at 57 (quoting *United States v. Larrabee*, 240 F.3d 18, 21-22 (1st Cir. 2001)). *See also United States v. Bhagat*, 436 F.3d 1140, 1149 (9th Cir. 2006)(also citing to *Larrabee* and its relevant factors).

The court discounted all of this evidence simply on its view that the factors' universal presence does not show that "the quantum of evidence" rose to the level of certainty required for conviction. RSA 8. But these factors are intended to guide a court's "examination of whether there was sufficient

evidence to support a conviction for securities fraud under" a theory that a tipper misappropriated insider information. *Chan*, 981 F.3d at 57 ("When we examine the evidence in this case, we find each of the six . . . factors is in fact met, especially given the uphill climb the defendants have when moving for a judgment of acquittal because we examine the evidence in the light most favorable to the prosecution."). Here, the district court acknowledged the presence of all six *Chan* factors, most of which, notably, were established by uncontroverted evidence.

The district court sought to distinguish *Chan*, describing the facts of that case as "weightier." RSA 8. Specifically, the court focused on the fact that, in *Chan*, "[t]here were mutual trades, money passing between the two defendants, and the concealment was more nefarious." *Id.* Contrary to the court's assessment, the absence of mutual trades or money passing between Klundt and Sargent did not make Klundt's concealment less nefarious or otherwise undermine the evidence of Sargent's guilt. There is no requirement that a tipper received a "personal benefit" of a pecuniary nature in return for providing valuable inside information; all that must be shown is that the tip was made with the intent to benefit the particular recipient. *See Salman v. United States*, 580 U.S. 39, 48-50 (2016) (*citing Dirks v. SEC*, 463 U.S. 646 (1983)). The undisputed evidence in this case showed that Klundt and Sargent had a close, longtime personal friendship, as well as a prior business

partnership, and the jury could reasonably infer that Klundt would wish to see

Sargent benefit from the rise in share value that could be anticipated based on

the insider information he shared with Sargent—and that Klundt would have

no trouble recognizing Sargent's name on the list circulated as part of the

FINRA inquiry. *See* 981 F.3d at 59.

In addition, contrary to the district court's assessment, the evidence here

is stronger than it was in *Chan* with respect to the timing of the Sargent's stock

purchases, which occurred immediately after his May 1, 2020, call with Klundt

and Klundt's receipt of highly positive inside information at an internal Chegg

meeting.

As the First Circuit noted in *Chan*:

> [T]here are dozens of pieces to the puzzle of whether the evidence
> presented in this case will, when assembled, … create a picture
> that supports the inference the defendants committed securities
> fraud. While we are missing a few pieces, such as the words on a
> screen or a transcript of a phone call where Wang told Chan to
> purchase shares in Merrimack, the evidence indicating Wang had
> MNPI about the NAPOLI-1 study from November 2013 through
> April 2014 and Chan's frequent purchases of shares of Merrimack
> stock during this same time period, coupled with the evidence of
> bank activity -- the withdrawals and deposits and transfers -- fit
> neatly together, particularly when that puzzle is being assembled
> on a table with explicit instructions to construe the evidence in the
> light most favorable to the prosecution. As we have mentioned
> already, Chan placed his largest order of Merrimack shares two
> days after Wang received the final data for the NAPOLI-1 study
> for analysis. Even though the puzzle is missing a few pieces, the
> big picture allowed a reasonable jury to conclude each defendant
> was guilty beyond a reasonable doubt of securities fraud, as
> charged in Count Two.

*Id.* at 59 (quotations, alteration, and citation omitted). Here, the undisputed evidence was that all six of the factors identified in *Chan* were present, demonstrating that the properly instructed jury in this case could reasonably find the elements of the charged offenses beyond a reasonable doubt.

Although the district court acknowledged the value of circumstantial evidence as a general matter, its analysis effectively imposed, contrary to settled law, a requirement that each element of the offense be proven with direct—rather than circumstantial—evidence. This was error. *See, e.g., Jones*, 713 F.3d at 340 ("Entirely circumstantial cases are not unusual, of course, and they certainly can provide constitutionally sufficient proof beyond a reasonable doubt.").

In fact, federal appellate courts consistently have upheld jury verdicts in insider trading cases against sufficiency challenges, based on circumstantial evidence. *See Bhagat*, 436 F.3d at 1149 (affirming securities fraud conviction where "Bhagat and Gill were friends; Bhagat had provided inside information to his real estate broker, with whom he shared a more distant relationship; Gill purchased stock shortly after Bhagat; and Gill's purchase was his largest purchase of the year."); *Larrabee*, 240 F.3d at 22-23 (affirming insider trading conviction where the government lacked direct evidence that tipper had access to inside information but "had the opportunity to access the information" and there was no direct evidence of what occurred during the call between tipper

and tippee); *United States v. Heron*, 323 F. App'x 150, 156 (3d Cir. 2009) (unpublished) (reversing judgment of acquittal and explaining that "[s]tanding alone, Heron's trading pattern, which involved an investment of the majority of his annual take-home pay, might be sufficient for a jury to infer guilt" but noting the government presented other circumstantial evidence of the insider's access to quarterly earnings); *United States v. Henke*, 222 F.3d 633, 639 (9th Cir. 2000) (upholding a jury conviction of insider trading based on "overall pattern of trading"). These cases and others like them make clear that the elements of insider trading fraud may be proven with circumstantial evidence, as well as that the jury's verdict in this case was supported by sufficient evidence.

The district court erred in overturning the jury's rational verdict, which was supported by ample evidence, and its judgment should be reversed.

### 3. The Jury's Verdict Convicting Sargent of Securities Fraud Was Not Contrary to the Weight of the Evidence and Did Not Warrant a New Trial.

After discussing the evidence and granting defendant's motion for judgment of acquittal under Rule 29, the district court only briefly addressed defendant's motion for a new trial under Rule 33, granting it "because the evidence in the light most favorable to the government cannot sustain a conviction," and in the alternative because "the verdict is so contrary to the weight of the evidence that a new trial is required in the interests of justice." RSA 9. The district court's decision to grant a new trial was based entirely on its analysis of the evidence under Rule 29.

As explained above, much of the evidence at trial was undisputed. The record is clear that Klundt obtained material, non-public information on May 1, that he spoke to Sargent about 30 minutes later, that within the next couple hours Sargent took aggressive bets on Chegg securities that he was not willing to make just 10 days earlier, that Sargent and Primer were expecting certain information to be announced during the May 4 earnings call, that Klundt and Sargent exchanged texts about the May 4 Chegg earnings announcement a few hours after it occurred, and that Klundt, at the very least, failed to report to FINRA his familiarity with Sargent. This was more than sufficient evidence for a rational jury to have convicted Sargent.

The district court gave no explanation for why, in the alternative, the verdict was so contrary to the weight of the evidence that a new trial was required in the interests of justice. The district court's decision on the motion for a new trial was apparently derivative of its findings on the motion for judgment of acquittal. For the same reasons that the district court erred in determining that the evidence was insufficient to permit a reasonable jury to find the essential elements of the charged offenses beyond a reasonable doubt, the court abused its discretion in determining that a new trial was warranted in the interest of justice.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment granting of Sargent's motion for judgment of acquittal and, alternatively, his motion for new trial, and reinstate the verdict of guilty against Sargent.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

/s/ *Matthew M. Getter*
MATTHEW M. GETTER
Assistant United States Attorney

# RULE 32 CERTIFICATION

I hereby certify that:

1.  This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 11,005 words.

2.  This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:      /s/ *Matthew M. Getter*
MATTHEW M. GETTER
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-7651

In the

# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## No. 24-1102

UNITED STATES OF AMERICA,

**Plaintiff-Appellant,**

v.

DAVID SARGENT,

**Defendant-Appellee.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 22 CR 15 — Manish S. Shah, *Judge.*

# SHORT APPENDIX OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Counsel, Criminal Division

MATTHEW M. GETTER
Assistant United States Attorney

# TABLE OF CONTENTS

Order Granting New Trial, December 20, 2023.........................................RSA 1

Judgment of Acquittal, December 19, 2023 ............................................RSA 2

Transcript of Proceedings, December 20, 2023 .......................................RSA 3

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| USA, | No. 22 CR 15 (2) |
| Plaintiff, | |
| v. | Judge Manish S. Shah |
| DAVID SARGENT, | |
| Defendant. | |

**ORDER**

(00:15)

For the reasons stated in open court, Defendant's post-trial motions for acquittal or new trial [101] are granted. Enter Judgment of Acquittal as to defendant Sargent. The Order Setting Conditions of Release [24] is vacated.

ENTER:

December 20, 2023

_____
Manish S. Shah
U.S. District Judge

RSA 1

✎ AO 245A  (Rev. 12/03) Judgment of Acquittal

# UNITED STATES DISTRICT COURT

NORTHERN                      DISTRICT OF                      ILLINOIS

UNITED STATES OF AMERICA

V.

David Sargent

## JUDGMENT OF ACQUITTAL

CASE NUMBER:  22 CR 15 (2)

     The defendant's motion for judgment of acquittal or new trial is granted.  IT IS ORDERED that the Defendant is acquitted, discharged, and any bond exonerated. Defendant's order setting conditions of release is vacated.

_____
Signature of Judge

**Manish S. Shah, U.S. District Judge**
_____
Name of Judge                    Title of Judge

**December 19, 2023**
_____
            Date

RSA 2

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3     UNITED STATES OF AMERICA,        )
                                        )
 4                    Plaintiff,        )
                                        )
 5          vs.                         )  No. 22 CR 15-2
                                        )
 6     DAVID SARGENT,                   )  Chicago, Illinois
                                        )  December 20, 2023
 7                    Defendant.        )  10:30 o'clock a.m.

 8                   TRANSCRIPT OF PROCEEDINGS -
                            Oral Ruling
 9            BEFORE THE HONORABLE MANISH S. SHAH

10

11     APPEARANCES:

12     For the Government:      HON. MORRIS O. PASQUAL
                                Acting United States Attorney
13                              219 South Dearborn Street, Suite 500
                                Chicago, Illinois  60604
14                              (312) 353-5300
                                BY:  MR. MATTHEW M. GETTER
15                                   MR. VIKAS K. DIDWANIA

16
       For the Defendant:      BENESCH FRIEDLANDER COPLAN & ARONOF
17                              BY:  MR. CHRISTOPHER T. GROHMAN
                                71 South Wacker Drive, Suite 1600
18                              Chicago, Illinois  60606
                                (312) 212-4943
19
                                TAFT STETTINIUS & HOLLISTER, L.L.P.
20                              BY:  MS. CARLY A. CHOCRON
                                111 East Wacker Drive, Suite 2800
21                              Chicago, Illinois  60601
                                (312) 836-4158
22

23             COLLEEN M. CONWAY, CSR, RMR, CRR
                      Official Court Reporter
24          219 South Dearborn Street, Room 1918
                   Chicago, Illinois  60604
25                      (312) 435-5594
               colleen_conway@ilnd.uscourts.gov
```

1      (Defendant present.  Proceedings heard in open court:)

2                THE CLERK:  22 CR 15, United States versus Sargent.

3                THE COURT:  You can stay seated.

4                MR. GETTER:  Good morning, Your Honor.  Matt Getter

5      and Vikas Didwania on behalf of the United States.

6                MR. GROHMAN:  Good morning, Your Honor.  Chris

7      Grohman and Carly Chocron on behalf of David Sargent, who's

8      present.

9                THE COURT:  Mr. Sargent is present.

10               Good morning, Mr. Sargent.

11               THE DEFENDANT:  Good morning.

12               THE COURT:  Thank you for your patience while I had

13     the motions under advisement.  I can give you the ruling now.

14               In most cases, it's not difficult to distinguish

15     reasonable inferences from speculation.  Proof beyond a

16     reasonable doubt can rest on circumstantial evidence.

17               To borrow the example that we use in the jury

18     instructions, a jury can be convinced that it was raining from

19     testimony of a witness who saw someone entering a room carrying

20     a wet umbrella.  Maybe the person with the umbrella was using

21     it as shade from the sun when they got hit with a sprinkler,

22     but that competing inference is not more reasonable than the

23     other.  And if the jury can draw an inference reasonably, the

24     inferred fact can be established beyond a reasonable doubt.

25               When a chain of inferences is necessary to establish

1  a fact, each link in the chain must be "sufficiently strong" to

2  avoid speculation. *United States v. Jones*, 713 F.3d 336, 340

3  (7th Circuit 2013). The weight of the evidence, and the

4  strength of the inference, is left to the jury, but "the judge

5  is still responsible for enforcing the outer limits on

6  reasonable inferences, guided by the relevant standard of

7  proof." *United States v. Garcia*, 919 F.3d 489, 497 (7th Circuit

8  2019). In criminal cases, the "required degree of certainty"

9  is, of course, beyond a reasonable doubt. *United States v.*

10  *Allen*, 383 F.3d 644, 649 (7th Circuit 2004).

11         When evaluating Mr. Sargent's motion for an acquittal

12  under Rule 29, I view the evidence in the light most favorable

13  to the government. A jury's verdict should be overturned only

14  when the record contains no evidence, regardless of how it is

15  weighed, from which the factfinder could find guilt beyond a

16  reasonable doubt. *United States v. Bard*, 73 F.4th 464, 479 (7th

17  Circuit 2023).

18         To find Mr. Sargent guilty, a jury would have to find

19  beyond a reasonable doubt that the insider, Mr. Klundt,

20  disclosed material, nonpublic information to Sargent so that

21  Sargent could trade using the information. The only

22  opportunity for Klundt to tip Sargent, consistent with the

23  evidence, was during a four-and-a-half-minute phone call on May

24  1st. To find Mr. Sargent guilty, a jury would have to be

25  convinced beyond a reasonable doubt that Klundt tipped Sargent

1    in that phone call.

2            There is suspicious evidence surrounding the phone

3    call.  The Klundt and Sargent families spoke before the

4    earnings announcement.  Klundt alerted Sargent to the day and

5    time of the earnings announcement.  Sargent had conveyed to

6    Primer some specific confidence in Chegg's online customer

7    engagement.  After the earnings call and the market reaction,

8    Klundt sent Sargent an unusual text message, the dollar sign

9    emoji, something Klundt hadn't sent to anyone else.  Sargent's

10   response was to congratulate Klundt on the quarter, confirming

11   that the emoji was a reference to the value of Chegg stock.

12   Before the earnings call, Sargent expressed an interest in

13   buying Chegg to Primer, but placed a limit order in April that

14   was not as confident in Chegg's prospects as the orders that

15   Sargent and Primer placed for Sargent's account on May 1st.

16           Viewing the evidence in the light most favorable to

17   the government, a jury could reasonably infer that Sargent

18   became more interested and more positive about trading in

19   Chegg, more bullish on Chegg, after his call with Klundt.  But

20   the basis for that bullishness could come from so many

21   different types of information, including public or immaterial

22   information about Chegg and the economy during the pandemic,

23   that a jury would have to guess that Klundt disclosed material,

24   inside information.  Viewing the evidence in the government's

25   favor, Klundt concealed his knowledge of Sargent from FINRA.

1     But that is not probative of Klundt's knowledge on May 1st,

2     that Sargent was going to trade based on inside information

3     disclosed by Klundt on May 1st.  The later concealment from

4     FINRA does not allow a jury to take the suspicious timing of

5     the call and infer the content of that call beyond a reasonable

6     doubt.

7          It is possible, even probable that Klundt tipped

8     Sargent.  But it is not an inference that can be held with the

9     certainty required for conviction.  There is no evidence that

10    Klundt was aware of Sargent's trading practices.  The upcoming

11    earnings call was on both of their minds, but nothing in the

12    record suggested that Sargent trading in Chegg around the time

13    of the earnings call was some mutually shared topic.

14          Not only was a jury required to find that Klundt

15    disclosed nonpublic, material information, but a jury would

16    have to also find that Klundt did so so that Sargent could

17    trade on it.  The record is bereft of evidence for that added

18    layer of Klundt's knowledge of Sargent's plan to trade.  The

19    emoji from Klundt is not enough to prove beyond a reasonable

20    doubt that Klundt knew Sargent was trading on Chegg.

21          The factors in *United States v. Chan*, C-h-a-n, 981

22    F.3d 39, 57 (1st Circuit 2020) are helpful.  Klundt had access.

23    Klundt and Sargent had a friendly relationship.  The timing of

24    the phone call was right for a disclosure of inside, material

25    information.  Sargent's trades came on the heels of his contact

1    with Klundt.  The pattern of his trades suggests Sargent felt

2    more confident after his call than before.  And Klundt omitted

3    his relationship to Sargent when asked.

4         But the presence of factors doesn't tell us whether

5    the quantum of the evidence in this case supports the level of

6    certainty required for conviction.  The facts in *Chan* were

7    weightier.  There were mutual trades, money passing between the

8    two defendants, and the concealment was more nefarious.  There

9    was no concealment by Mr. Sargent here.

10        Although I am confident that the jury was properly

11   instructed and the evidence before it was properly admitted,

12   including the preponderance of the evidence to support the

13   admissibility of co-conspirator statements, I do conclude that

14   this was the rare and unusual case that fell short of the

15   necessary inference beyond a reasonable doubt, and I grant the

16   defendant's motion under Rule 29.

17        I reject the other arguments raised by the defense.

18   The inconsistency between an acquittal for Klundt and a

19   conviction for Sargent is not one that requires or demands

20   correction.  The jury was told to consider each defendant

21   separately.  And I, too, evaluate the case against Sargent

22   separately, without regard to the jury's verdict against

23   Klundt.  Although the trials were simultaneous, the defendants

24   were considered separately, so it was not impermissible for the

25   jury to arrive at different verdicts for the two defendants.

1    Any inconsistency there is tolerated by our jury system.

2           I agree with the government that Mr. Sargent waived

3    any objection based on venue.  No pretrial motion was filed; no

4    jury instruction on venue proposed.  The defense did know from

5    the indictment and from their own access to information whether

6    there was a basis to challenge venue, and they chose not to

7    raise it.

8           I also agree that Mr. Primer's conduct in the

9    Northern District of Illinois were acts that were part of the

10   offense and caused by Mr. Sargent, which would be sufficient to

11   establish venue.  Executing the trades was not incidental or

12   ancillary to the offense of insider trading.

13          The government's cross-examination and comment about

14   the lack of evidence of Mr. Sargent's research was an

15   appropriate comment on the weight of Mr. Berstein's testimony

16   and on evidence available from Primer.  It was not a comment on

17   Mr. Sargent's failure to introduce evidence or testify.  It was

18   fair game from the defense decision to present evidence.

19          But because the evidence in the light most favorable

20   to the government cannot sustain a conviction, I also conclude

21   under the standards of review under Rule 33, and in the

22   alternative, that the verdict is so contrary to the weight of

23   the evidence that a new trial is required in the interests of

24   justice.

25          In my view, it is more likely than not that both Mr.

1    Klundt and Mr. Sargent engaged in insider trading, but the

2    criminal standard of proof was not met.  This is not a decision

3    to be done lightly, and we trust juries with these decisions,

4    but there are rare cases when the case falls short

5    notwithstanding a jury's verdict.

6            So Mr. Sargent's motion is granted.  The clerk will

7    enter a judgment of acquittal, and the order setting conditions

8    of release is vacated.

9            Is there anything else for me to address from the

10   government's perspective?

11           MR. GETTER:  Your Honor, my only question is, will a

12   written opinion follow?

13           THE COURT:  No.

14           MR. GETTER:  Okay.

15           THE COURT:  It's for the reasons stated in open

16   court --

17           MR. GETTER:  Okay.

18           THE COURT:  -- the motion is granted.

19           Anything further from the defense?

20           MR. GROHMAN:  No.  Thank you, Your Honor.  Have a

21   happy holiday.

22           THE COURT:  We're in recess.

23           MR. GETTER:  Thank you very much, Your Honor.

24           MS. CHOCRON:  Thank you.

25       (Proceedings concluded.)

1        C E R T I F I C A T E

2

3

4

5            I, Colleen M. Conway, do hereby certify that the

6    foregoing is a complete, true, and accurate transcript of the

7    Oral Ruling proceedings had in the above-entitled case before

8    the HONORABLE MANISH S. SHAH, one of the Judges of said Court,

9    at Chicago, Illinois, on December 20, 2023.

10

11

12        _/s/ Colleen M. Conway, CSR, RMR, CRR_      _12/21/2023_

13            Official Court Reporter            Date
             United States District Court
14           Northern District of Illinois
                 Eastern Division
15

16

17

18

19

20

21

22

23

24

25

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(D)

Pursuant to Circuit Rule 30(d), I, Matthew M. Getter, counsel for Plaintiff-Appellant, UNITED STATES OF AMERICA, state that the appendix included with this brief on appeal incorporates the materials required under Circuit Rule 30(a) and (b).

By:       */s/ Matthew M. Getter*
          MATTHEW M. GETTER
          Assistant United States Attorney
          219 South Dearborn Street, 5th Floor
          Chicago, Illinois
          (312) 886-7651

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2024, I electronically filed the foregoing Brief and Short Appendix of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:     /s/ *Matthew M. Getter*
        MATTHEW M. GETTER
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois
        (312) 886-7651