# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

## UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

## DAVID SARGENT,
*Defendant-Appellee.*

---

On Appeal From the United States District Court
For the Northern District of Illinois, Case No. 1:22-cr-15-2
Honorable Manish S. Shah

---

## BRIEF OF APPELLEE DAVID SARGENT

---

Christopher T. Grohman
Ryan J. Levitt
**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF**
71 South Wacker Drive, Ste. 1600
Chicago, IL 60606
Telephone: (312) 515-7313
Email: cgrohman@beneschlaw.com
　　　　rlevitt@beneschlaw.com
Attorneys for Appellee

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Court of Appeals No.:  24-1102

Short caption:  United States v. David Sargent

Full name of every party represented:  David Sargent

Names of law firms and lawyers that appeared for the party:

> **TAFT STETTINIUS & HOLLISTER LLP**
> 111 East Wacker Drive, Suite 2800
> Chicago, IL 60601
> Carly Allana Chocron
> Elizabeth Ann Winkowski
> Peter E. Deegan
>
> **KOPECKY SCHUMAHCER ROSENBURG LLC**
> 120 North LaSalle Street, Suite 2000
> Chicago, IL 60601
> James L. Kopecky
>
> **BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**
> 71 South Wacker Drive, Suite 1600
> Chicago, IL 60606
> Christopher T. Grohman
> Ryan J. Levitt

Attorneys' printed name and address:

> Christopher T. Grohman
> Ryan J. Levitt
> **BENESCH FRIEDLANDER COPLAN & ARONOFF LLP**
> 71 South Wacker Drive, Suite 1600
> Chicago, IL 60606
> Telephone: (312) 515-7313
> Email: cgrohman@beneschlaw.com
>           rlevitt@beneschlaw.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES ON APPEAL ......................................... 2

STATEMENT OF THE CASE ............................................................... 3

SUMMARY OF ARGUMENT ............................................................... 14

ARGUMENT ...................................................................................... 15

I.     THE DISTRICT COURT CORRECTLY GRANTED SARGENT'S MOTION FOR ACQUITTAL AFTER IT FOUND THAT THE GOVERNMENT'S EVIDENCE AS TO KEY ELEMENTS OF THE OFFENSE AMOUNTED TO NOTHING MORE THAN SPECULATION ................................. 15

    A.    Standard of Review ............................................................. 15

    B.    Argument ........................................................................... 17

        i.    The District Court Correctly Found that Key Elements of the Offense Were Based on Speculation ................. 17

        ii.    The Government's Reliance on Other Insider Trading Cases is Irrelevant to the Facts of Sargent's Case ...... 31

        iii.    This Court Should Affirm the District Court's Judgment of Acquittal ................................................................. 36

II.    IN THE ALTERNATIVE, THE DISTRICT COURT'S RULING SHOULD BE AFFIRMED BASED ON THE IRRECONCILABLE INCOSISTENCIES IN THE JURY'S VERDICTS ...................................................................... 399

    A.    Standard of Review ............................................................. 39

    B.    Analysis .............................................................................. 39

III.   IN THE ALTERNATIVE, THE DISTRICT COURT CORRECTLY GRANTED SARGENT'S MOTION FOR A NEW TRIAL ...................................................................... 477

    A.    Standard of Review ............................................................. 47

    B.    Analysis .............................................................................. 49

CONCLUSION .................................................................................. 51

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Carpenter v. United States*,
484 U.S. 19 (1987)................................................................29

*Coleman v. Johnson*,
566 U.S. ——, ——, 132 S.Ct. 2060, 182 L.Ed.2d 978
(2012) ...................................................................................18

*Sonnleitner v. York*,
304 F.3d 704 (7th Cir. 2002)...............................................38

*United States v. Allen*,
383 F.3d 644 (7th Cir. 2004)........................................18, 35

*United States v. Armbruster*,
48 F.4th 527 (7th Cir. 2022) ...............................................16

*United States v. Ashraf*,
628 F.3d 813 (6th Cir.2011)................................................39

*United States v. Bailin*,
977 F.2d 270 (7th Cir.1992)................................................42

*United States v. Bhagat*,
436 F.3d 1140 (9th Cir. 2006)............................................31

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005) ...........................................31, 32

*United States v. Chan*,
981 F.3d 39 (1st Cir. 2020) ......................................32, 33, 34

*United States v. Conley*,
875 F.3d 391 (7th Cir. 2017)...............................................46

*United States v. Delay*,
440 F.2d 566 (7th Cir. 2071)...............................................16

ii

*United States v. Dotterweich*,
   320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) .................................. 40

*United States v. Evans*,
   486 F.3d 315 (7th Cir. 2007) ............................................. 40, 41, 42, 43

*United States v. Garcia*,
   919 F.3d 489 (7th Cir. 2019) ............................................. 17, 18, 19, 37

*United States v. Groves*,
   470 F.3d 311 (7th Cir. 2006) ................................................................. 19

*United States v. Henke*,
   222 F.3d 633 (9th Cir. 2000) ................................................................. 31

*United States v. Henning*,
   286 F.3d 914 (6th Cir. 2002) ................................................................. 16

*United States v. Heron*,
   323 F. Appx 150 (3d Cir. 2009) (unpublished) .................................. 32

*United States v. Jones*,
   713 F.3d 336 (7th Cir. 2013) ............................................. 15, 16, 17, 37

*United States v. Katz*,
   582 F.3d 749 (7th Cir. 2009) ................................................................. 17

*United States v. Klein*,
   913 F.3d 73 (2nd Cir. 2019) ................................................................. 31

*United States v. Larrabee*,
   240 F.3d 18 (1st Cir. 2001) ............................................................. 29, 31

*United States v. Lawrence*,
   555 F.3d 254 (6th Cir. 2009) ................................................................. 39

*United States v. Lewis*,
   521 F. Appx. 530 (6th Cir. 2013). ........................................................ 47

*United States v. Lopez*,
   576 F.2d 840 (10th Cir. 1978) .............................................................. 47

*United States v. Moreno,*
    922 F.3d 787 (7th Cir. 2019) ................................................. 16

*United States v. Persfull*
    600 F.3d 824 (7th Cir. 2011) ................................................. 16

*United States v. Pierce,*
    940 F.3d 817 (2d Cir. 2019) ................................................. 39

*United States v. Powell,*
    469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) ...................... 38, 40

*United States v. Rajewski,*
    526 F.2d 149 (7th Cir. 1975) ................................................. 29

*United States v. Randolph,*
    794 F.3d 602 (6th Cir. 2015) ............................................. 39, 45

*United States v. Reed,*
    875 F.2d 107 (7th Cir. 1989) ................................................. 46

*United States v. Ruiz,*
    386 Fed.Appx. 530 (6th Cir.2010) ......................................... 39

*United States v. Salerno,*
    108 F.3d 730 (7th Cir.1997) ................................................. 42

*United States v. Shippley,*
    690 F.3d 1192 (10th Cir.2012) ........................................... 39, 45

*United States v. Van Eyl,*
    468 F.3d 428 (7th Cir. 2006) ................................................. 46

*United States v. Washington,*
    184 F.3d 653 (7th Cir. 1999) ................................................. 47

## Statutes

15 U.S.C. § 78ff(a) ............................................................. 1, 3

15 U.S.C. § 78j(b) ...................................................................... 1, 3

18 U.S.C. § 371............................................................................ 1, 3

18 U.S.C. § 1348(1) ..................................................................... 1, 3

18 U.S.C. § 3231........................................................................... 2

18 U.S.C. § 3731........................................................................... 2

28 U.S.C. § 1291........................................................................... 2

**Other Authorities**

17 C.F.R. § 240.10b-5................................................................. 1, 3

58 AM.JUR.2D NEW TRIAL § 391 (1989) ............................... 47

Benjamin Franklin, "Letter from Benjamin Franklin to Benjamin Vaughn (Mar. 14, 1785)," *The Works of Benjamin Franklin 11*, ed. John Bigelow (1904), quoted in Alexander Volokh, "n Guilty Men," *University of Pennsylvania Law Review* 146 (1997): 173-216 ............................... 38

Harvard Law School Forum on Corporate Governance, United States v. Blaszczak Continues to Reshape Insider Trading Law

# JURISDICTIONAL STATEMENT

The government's jurisdictional statement is not complete and correct.

On January 10, 2022, Defendants Christopher Klundt and David Sargent were charged in an indictment with one count of conspiracy to commit securities fraud through insider trading, in violation of 18 U.S.C. § 371; three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5; and three counts of securities fraud, in violation of 18 U.S.C. § 1348(1). R. 1.[1]

On January 19, 2023, after a two-week trial, the jury acquitted Klundt on all counts, acquitted Sargent on the conspiracy count, but convicted Sargent on all six securities fraud counts.

Prior to the jury rendering its verdict, at the conclusion of the government's case-in-chief, both Defendants moved for judgments of acquittal pursuant to Fed. R. Crim. P. 29. R. 90 at 792, 799. The district court took the matters under advisement pursuant to Rule 29(b). R. 90

---

[1] Citations to the district court docket are to "R.," followed by the document number. Citations to transcripts of district court proceedings are to "R," followed by the relevant docket number and then the page number on the transcript. Citations to the government's exhibits admitted at trial are to "G. Ex.," or "Klundt/Sargent. Ex." followed by the exhibit number; the government's exhibits that are cited in this brief can be found at R. 121 and the defendants can be found at R. 124.

at 806. The district court then held a status hearing on Sargent's Rule 29 motion on February 23, 2023, where it discussed its thinking and its inclination to grant Sargent's Rule 29 motion. R. 102.

On December 20, 2023, the district court granted Sargent's motion for judgment of acquittal and, alternatively, for a new trial and entered judgment of acquittal on the district court docket. R. 111, 112.

On January 17, 2024, the government timely filed a notice of appeal. R. 114.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. Jurisdiction in the Court of Appeals is provided by 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES ON APPEAL

1.     Did the district court properly grant Sargent's motion for judgment of acquittal where the evidence presented at trial showed that: (a) Sargent planned to make the trades in question prior to having the ability to have garnered inside information;, (b) Sargent had no part in picking the mix of trades; and, (c) conviction required the jury to speculate its way out of reasonable doubt based on a chain of dubious inferences on essential elements of the charged crimes?

2. In the alternative, did the jury's irreconcilable inconsistent verdicts require Sargent's acquittal?

3. Did the district court properly grant Sargent's motion for a new trial after it found that the jury's verdict went against the manifest weight of the evidence?

## STATEMENT OF THE CASE

### A. The Charges

Defendant David Sargent and his co-defendant, Christopher Klundt, were charged by indictment on January 10, 2022, with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count 1); securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5 (Counts 2-4) and 18 U.S.C. § 1348(1) (Counts 5-7). R. 1. These charges related solely to the government's allegation that on May 1, 2020, Sargent purchased options and stock in Chegg, Inc., of which Christopher Klundt was an employee. R. 1. Sargent sold the options on approximately May 5, 2020, and the stock in June 2020, for a total profit of approximately $110,000, which he subsequently lost in the next several months, ironically enough, by buying additional Chegg options that ended up out of the money. R. 1.

Although the government attempted to argue a standard tipper-tippee insider trading theory on Counts 2-4 and a misappropriation from Chegg theory on Counts 5-7, this Court found that the misappropriation theory was inadequately pled. R. 93 at 1111-1113. So, essentially, the charges presented to the jury amounted to conspiracy to commit insider trading (Count 1), willfully committing insider trading (Counts 2-4), and committing insider trading (Counts 5-7). R. 80.

B.    The Government's Theory As Presented at Trial

The government's theory on what specific material inside information Klundt transmitted to Sargent and when exactly he transmitted it was hazy at best. In the indictment, the government noted that Klundt only attended a pre-earnings meeting on May 1, 2020, at which Chegg's First Quarter 2020 earnings were discussed. R. 1 at ¶1(f). At trial, the government argued that sometime prior to the evening of April 21, 2020, Sargent and Klundt had a conversation during which Klundt told Sargent the incorrect date of the earnings meeting and that there would be a pre-earnings meeting on May 1, 2020.[2] R. 94 at 1255,

---

[2] There is not a single text message between the two men referencing a May 1st pre-earnings call, so the government's theory shifted to claim that they discussed the

1283. Under the government's theory, the pair then apparently decided that Sargent would wait to trade in Chegg stock until May 1, 2020, because Klundt would obtain the material inside information during that May 1, 2020 pre-earnings meeting and then transmit it to Sargent via phone after the meeting. R. 94 at 1267-1269, 1285. The government did not specify exactly what the material inside information that Klundt tipped to Sargent was, although it argued that it was something from the CEO/CFO's April 27, 2020 script that was recorded during the May 1, 2020, meeting. R. 94 at 1272; Gov. Exh. 13. Notably, this script is devoid of any mention of "subscriber activity."[3]

---

existence of this call on one of their many zoom game nights that also included their spouses. Everyone was in on it!

[3] During its closing arguments, the government argued that David Primer's reference to a 200 percent increase in "one of the engagement metrics" in a May 4, 2020 text message with Sargent showed that Klundt had tipped Sargent about this particular figure (R. 94 at. 1272) – apparently, it was the government's theory that this information came from an April 27, 2020 script (Gov. Exh 12 attached hereto as Exh. B) that stated "[i]n just the last two weeks of March new subscribers grew 119% year-over-year" . . . and engagement went up 26%." R. 86 at 234; Exh B.

Based on footnote 7 of the government's brief, it seems like they have correctly backed off this argument. There is absolutely zero evidence that Klundt had access to the April 27, 2020, script which was scrapped before the May 1, 2020 meeting. R. 85 at 145-146; R. 86 at 217-218, 233, 236. To the contrary, Chegg representatives testified this script was not sent to Klundt. R. 85 at 146; R. 86 at 217-218, 233. Moreover, 119% and 200% are not the same number. R. 86 at 234-235, 275. Indeed, the figure Sargent referred to likely came from a Seeking Alpha Article that he had forwarded to Primer prior to trading. *See* Sargent Exh. 4.

C. **The Evidence Supporting the Government's Theory During Its Case-in-Chief**

The government introduced the following evidence during its case-in-chief:

● An April 21, 2020, text message from Klundt to Sargent that stated: "I misspoke. The earnings call with Wall Street is May 4tg (sic)." R. 87 at 356.

● The fact that at 12:50 p.m. EST on April 21, 2020, Sargent placed a limit trade requesting to purchase 28 shares of Chegg stock worth a total of approximately $985 if the price per share dipped below $35.15 when the stock was currently trading at $36.40, and the order expired at the close of the market that day without being executed;  R. 87 at 375-377; R. 88 at 494-496.

● The fact that Sargent talked to Klundt shortly after the May 1, 2020 pre-earnings call for approximately four and a half minutes. R. 87 at 368.

● The fact that Sargent purportedly went "all-in" on Chegg several hours later on May 1, 2020, purchasing approximately $11,000 in Chegg stock and $30,000 in Chegg options ($10,000 at a strike price of $50 and

$20,000 at a strike price of $40) (R. 88 at 477, 500-503, 523; R. 89 at 577-578) when the stock was currently trading at $42.36. R. 89 at 597.

- The government's expert's opinion testimony that the mix of options was particularly risky. R. 88 at 554; R. 89 at 614.

- Sargent's income returns, which showed his income for tax year 2018 was $103,838, for tax year 2019 as $129,639, and for tax year 2020 was $229,832. R. 86 at 312-313.

- That Sargent had to use approximately $8,000 worth of margins to complete his options trades. R. 87 at 438-439.

- A text message from Klundt to Sargent after the earnings call with the emoji, "🤑", to which Sargent responded: "Congratulations on a great quarter! The analysts are swooning 👏." R. 87 at 358-359.

- Klundt's failure to identify that he knew Sargent in response to a lengthy FINRA questionnaire issued to him on or about September 28, 2020.[4] R. 90 at 717-720.

---

[4] To the extent that the government argues this is some sort of cover-up, it is notable that there was no contact between Sargent and Klundt anywhere around September 28, 2020, which would be expected if Klundt saw Sargent's name on this list and intentionally tried to cover-up his involvement. R. 91 at 901-903.

The government does not dispute that the entirety of its evidence is circumstantial. *See Gov.* Appellant's Brief p. 23. The only direct evidence presented during the government's case-in-chief came from David Primer, who testified:

- Sargent gave Primer $54,000 in 2019 to trade on VIX options (R. 89 at 665.

- Sargent traded airline options and stocks in March 2020 because he believed the airlines would suffer due to the COVID-19 pandemic. R. 89 at 583-584, 669; R. 90 at 705.

- Sargent profited by an additional $6,000 from these airline trades. R. 89 at 584.

- Sargent and Primer then decided to withdraw $50,000 from this trading account because they needed to pause their VIX strategy. R. 89 at 666-667.

- In mid-April 2020 (most likely during a phone call on April 21), Sargent approached Primer and told Primer he wanted to invest in Chegg. R. 89 at 632, 644, 654; R. 90 at 704.

- Sargent had made up his mind in mid-April 2020 that he was in fact going to invest in Chegg. R. 89 at 658.

● It was David Primer's decision, not Sargent's, to wait until May 1, 2020 to trade Chegg stock and options. R. 89 at 637-638, 658, 675.

● Primer chose the various strike prices for the options, not Sargent. R. 89 at 638-639, 675-676.

● Primer was the one who looked at the trading account to determine the amount of money available to trade. R. 89 at 668; R. 90 at 694-695.

● It was Primer who reached out to Sargent on the morning of May 1, 2020 to remind Sargent that they should trade Chegg that day. R. 89 at 637.

● Sargent repeatedly told Primer why he wanted to trade in Chegg – it was an online education company at the start of a national pandemic. R. 89 at 654-655; R. 90 at 696, 701-702.

● Sargent did research on Chegg in the form of looking at analyst reports and online sentiment, some of which he forwarded to Primer. R. 89 at 657-658, 674-675; R. 90 at 686.

● On May 6, 2020, Sargent traded Chegg puts which had significant downside. R. 90 at 693.

● Around this same time, Sargent and Primer invested in other "COVID-positive" stocks, such as McKesson, Steris, and K-12 education. R. 89 at 672-673; R. 90 at 686-691.

At the conclusion of the government's case-in-chief, both Defendants moved for judgments of acquittal pursuant to Fed. R. Crim. P. 29. R. 90 at 792, 799. This Court took the matters under advisement pursuant to Rule 29(b). R. 90 at 806.

### D.   The Defense Case

Defendant Klundt testified. R. 91 at 830. He testified that on April 20, 2020, he, Sargent, and both their wives had a FaceTime call that lasted over an hour to celebrate Klundt's wife's birthday. R. 91 at 873-874. As Sargent did not have an iPhone, any FaceTime calls necessarily would have gone to Christina Sargent's phone.  R. 93 at 1119-1120. At that time, Klundt was living with his in-laws in Minnesota, having moved there from San Francisco during the pandemic. R. 91 at 871-872. He testified that he may have told Sargent when the earnings call was scheduled but had no specific memory of doing so or the reason for doing so. R. 91 at 875. He denied knowing that Sargent planned to trade in Chegg stock. R. 91 at 880. More importantly, he was unequivocal that he

never–either intentionally or by accident–supplied Sargent with material inside information.

R. 91 at 883:

> "Q: [D]id you tell Mr. Sargent what you had learned at that May 1st meeting?
>
> A: Absolutely not.
>
> Q: Did you give him information about how Chegg had performed during the first quarter?
>
> A: Definitely not.
>
> Q: Did you tell him, "Chegg stock's gonna jump up. You better buy"?
>
> A: No.
>
> Q: Do you remember exactly what you said during that call?
>
> A: No, I do not.
>
> Q: Then, how, sir, are you so certain you didn't give him this inside information and said, "Hey, go trade. Make some money""?
>
> A: Because I would never do that. I would never do that. I just got off a call with the CEO and CFO who said, "This is what we're going to be talking about. This is very private information. Don't share this information." I wouldn't – it was fresh in my mind. I wouldn't share that information. I – it's not something I did. I didn't do it with Dave. I didn't do it with other friends. I didn't even give that information to my wife or family."

R. 91 at 903-904:

> Q: Mr. Klundt, did you ever give Dave Sargent any inside, confidential information about Chegg?
>
> A: No, I did not.
>
> Q: Did you ever give anybody inside, confidential information about Chegg?
>
> A: No.
>
> Q: Related to the May 4th earnings call?
>
> A: No.
>
> Q: Ever?
>
> A: No.
>
> Q: Do you have any doubt about that, sir?
>
> A: I have no doubt.

R. 92 at 984:

> Q: Did you ever give inside information to Mr. Sargent, sir?
>
> A: Absolutely not.

Likewise, he testified that he never told Sargent when the pre-earnings call was to occur. R. 91 at 875. Indeed, he did not have knowledge of when the call was scheduled for until April 22, 2020. R. 85 at 148-53.

Finally, Klundt testified that his failure to identify Sargent on the September 28, 2020, FINRA form was inadvertent, as he was distracted by a new baby and solely concerned with scanning the form for the name of the only person with whom he invested, who was not Sargent. R. 91 at 890-892, 896-900. And, between September 8, 2020 and October 28, 2020, Klundt and Sargent did not have any communication. R. 91 at 901-903.

Sargent's wife, Christina Sargent, also testified for the primary purpose of providing evidence regarding the assets that the Sargents possessed – not for the purpose of arguing that "people who have money" do not commit crimes as the government intimated in its closing argument (R. 95 at 1368), but rather to refute the government's argument that a $40,000 wager on Chegg was a significant investment for Sargent. R. 94 at 1260, 1273. Christina Sargent also testified that at the time of the May and June 2020 Chegg trades, Sargent and his family were living in Florida, not Chicago. R. 92 at 999.

Lastly, Klundt called two character witnesses who testified that Klundt was honest and law-abiding. R. 93 at 1209, 1217-1218.

Paradoxically, the jury acquitted Klundt on all charges, acquitted Sargent on the conspiracy charge, but convicted Sargent on the six substantive counts of insider trading. R. 96 at 1390-1391.

## SUMMARY OF ARGUMENT

The district court correctly granted Sargent's Rule 29 and Rule 33 motions. As to the Rule 29 motion, the district court was correct that inferences that go to the element of the offense, such as whether Klundt gave inside information to Sargent knowing that he was going to trade on it, need to be proved beyond a reasonable doubt, and that the government failed to meet that burden. R. 102 at 8; R. 113. Likewise, the Court was correct that this is the rare case where the "piling of inference upon inference" fell so short that a rational jury could not find Sargent guilty beyond a reasonable doubt. *Id.* This was doubly so because the government's theory required the jury to make one inference based on another, but to make inferences regarding the essential elements of the charged offenses.

In the alternative, given that the charges, evidence, legal elements, and theories, were the exact same as to Klundt and Sargent, the jury's

acquittal of Klundt but conviction of Sargent defies all logic, and is so inconsistent that Sargent's acquittal should be affirmed.

Should this Court need to reach the question of whether the district court correctly granted Sargent's motion for a new trial, this Court should affirm because the district court did not abuse its discretion. The district court appropriately weighed the testimony of the witnesses in this case, in particular David Primer, who testified that the trades in question were locked and loaded prior to the time Sargent could have had inside information and concluded that the verdict was against the manifest weight of the evidence.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY GRANTED SARGENT'S MOTION FOR ACQUITTAL AFTER IT FOUND THAT THE GOVERNMENT'S EVIDENCE AS TO KEY ELEMENTS OF THE OFFENSE AMOUNTED TO NOTHING MORE THAN SPECULATION

### A. Standard of Review

This Court reviews *de novo* the district court's grant of a judgment of acquittal. *United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013). A judgment of acquittal must be granted when the "evidence is insufficient to sustain a conviction." *Id.* (7th Cir. 2013), quoting Fed. R. Crim P. 29(a) & (c). When applying Rule 29, this Court asks whether,

viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 340, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This Court has sometimes said that this is a high, "nearly insurmountable hurdle." *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022), quoting *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017). But it has also observed that "the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019), quoting *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019). "If the evidence would not allow a civil case to survive a motion for summary judgment or a directed verdict, then the case has no business being given to a jury in a criminal trial." *Id.* Moreover, evidence is insufficient "[w]here the evidence as to an element of a crime is equally consistent with a theory of innocence as with a theory of guilt." *United States v. Persfull*, 660 F.3d 824 (7th Cir. 2011) (citing *United States v. Delay*, 440 F.2d 566, 568 (7th Cir. 1971)).

Further, here, where Sargent was acquitted by the jury on the conspiracy count, "[d]ue to the close relationship between the substantive

and conspiracy crimes, which was created by the *Pinkerton* instruction, an automatic consideration of the viability of the substantive convictions should [be] undertaken by the district court when the defendant was acquitted of the conspiracy conviction." *United States v. Henning,* 286 F.3d 914, 920 (6th Cir. 2002).

**B.** <u>Argument</u>

    *i.*    *The District Court Correctly Found that Key Elements of the Offense Were Based on Speculation*

"A jury cannot speculate its way out of reasonable doubt." *United States v. Katz*, 582 F.3d 749, 750 (7th Cir. 2009). Here, the district court correctly found that each link in the government's purely circumstantial case was not "sufficiently strong" to avoid speculation. R. 113 at 4-5 citing *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013).

Typically, the government likes to point out that, given the deferential standard, it is quite rare for a Rule 29 motion to be granted. True enough. But that's because the government has an overwhelming amount of evidence in most of its cases. As this Court exhaustively detailed in *United States v. Garcia*, the granting of a Rule 29 motion is not that rare in cases where the only evidence is circumstantial. 919 F.3d 489, 496-97 (7th Cir. 2019) ("the height of the hurdle depends directly on

the strength of the government's evidence"); *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). Indeed, the "hurdle is lower" when the government's case rests on a string of inferences. *See id.*

*Garcia* is this Court's capstone case on how to evaluate a Rule 29 motion in a purely circumstantial evidence case and collects and analyzes several previous decisions granting Rule 29 motions, which need not be separately recounted here. In summary, the *Garcia* court held that when considering a Rule 29 motion in a circumstantial evidence case, a judge must take special care to guard against the possibility that a defendant might be found guilty by either speculation or mere association. *Id.* at 503. This Court reasoned that circumstantial evidence leading only to a "strong suspicion that someone is involved in a criminal activity is no substitute for proof of guilt beyond a reasonable doubt." *Id.* at 503, citing *Piaskowski v. Bett*, 256 F.3d 687, 692 (7th Cir. 2001). Thus, when a case "consists entirely of inferences the government argues may be drawn" from circumstantial evidence the Court must decide "whether this evidence permits an inference beyond a reasonable doubt." *Id.*, citing *Allen*, 383 F.3d at 647.

This Court further recognized that a Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation. Each step in the inferential chain must be supported by evidence that allows the jury to "draw reasonable inferences from basic facts to ultimate facts." *Coleman v. Johnson*, 566 U.S. ——, ——, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012). "Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski*, 256 F.3d at 693. "Speculation cannot be the basis for proof in the civil context much less the basis for proof beyond a reasonable doubt." *United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006); *Garcia* citing *United States v. Allen*, 383 F.3d 644 (7th Cir. 2004) (reversing 922(g) conviction and stating: "While the district judge's inferences were reasonable, we reversed. The question was not whether a logical set of inferences could show the charge was possibly, or even likely true, but whether it could be inferred *beyond a reasonable doubt* that the defendant was guilty as charged.") (emphasis in original).

The district court, after viewing the evidence in the light most favorable to the government, found that several of the government's

contentions could not be inferred beyond a reasonable doubt and properly granted Sargent's motion for acquittal. This Court should affirm that ruling because the links in the government's chain of inferences—based upon other circumstantial inferences as they were—are not strong enough to survive the scrutiny that this Court must give them. Each piece of tenuous, inferential evidence will be discussed in turn.

> ● An April 21, 2020, text message from Klundt to Sargent that stated: "I misspoke, the earnings meeting is scheduled for May 4, 2020." R. 87 at 356.

There is no dispute that Sargent listened in on the May 4, 2020 earnings meeting. R. 89 at 646. Likewise, there should be no dispute that, based on the testimony of Primer, prior to receiving this text message from Klundt, Sargent had already told Primer that he was going to trade in Chegg stock because he thought it would benefit from the pandemic. R. 89 at 637-638, 654-656. And this was prior to Klundt being in possession of any material inside information or even knowing that he would be invited to a pre-earnings call. R. 85 at 149-152. Sargent had conversations with Primer regarding trading on April 17 and April 21,

and it was not until April 22 that Kundt learned that there would be a "pre-earnings meeting." R. 87 at 394-97; G. Ex. 60.[5]

Further, there is no evidence that Klundt even knew that there would be material inside information shared during this meeting, as the government presented no evidence, he knew what would be discussed or that he had ever attended one of these meeting before. R. 92 at 941-943.

Further, as Primer testified, he and Sargent listened in on multiple earnings calls to see the results of their "Covid positive bets." R. 90 at 690-692. This text message is not incriminating and provides no proof that Klundt knew that Sargent even planned to trade in Chegg. Sargent had been following Chegg and Chegg's earnings in the media for years. R. 86 at 238-240; R. 89 at 674-675; R. 91 at 855-857; R. 94 at 1298-1299.

> ● The fact that at 12:50 p.m. EST on April 21, 2020, Sargent placed a limit trade requesting to purchase 28 shares of Chegg stock worth a total of approximately $985 if the price dipped below $35.15 per share when the stock was currently trading at $36.40, and the order expired at the close of the market that day without being executed; R. 87 at 375-377; R. 88 at 494-496.

The government wanted the jury, and now wants this Court, to infer that since Sargent was reluctant to buy Chegg at a $36.40 price on

---

[5] Gov. Exh 60 does not contain all the calls between the dates in question, but rather select calls. R. 90 at 780.

April 21, 2020, yet bought it for $42 on May 1, 2020, the only rational reason for this action is the insider information Klundt gave him on May 1, 2020. R. 94 at 1261-1262. However, this line of reasoning ignores the direct evidence presented. Shortly after Sargent, who had no history of placing limit orders, placed that trade request on April 21, 2020, Primer told him they should wait until May 1, 2020 to trade.  R. 89 at 637-638, 658.  It also ignores the increasingly positive analyst reports on Chegg between April 21 and May 1, which the emails and texts admitted at trial show that Sargent read.  R. 86 at 271-274; R. 89 at 657-658, 674-675.

The government's take on Sargent's motivation behind the limit order is pure speculation.

● The fact that Sargent talked to Klundt shortly after the May 1, 2020, pre-earnings call for approximately four-and-a-half minutes. R. 87 at 368.

The timing of the call could, when viewed in unreasonable isolation, appear suspicious, but there is simply no evidence of what was discussed on the call.  Maybe Sargent was hoping Klundt would generally speak about how well the company was doing?  Maybe they were setting up a

time to play an online board game? R. 87 at 357-358.[6] A full examination of the phone records admitted into evidence shows that there were regular attempts to connect and connected calls between Sargent and Klundt from January 2019 and November 2020 and over 500 text messages. R. 87 at 398, 340, 401-402, 409. Despite all this contact, the government cannot show a single text message before May 1, 2020, indicating that Klundt either gave Sargent material inside information or told him that the Chegg pre-earnings call was going to occur on May 1, 2020.

Indeed, in its brief, the government points to the suspicious timing of the May 1st call as evidence that Klundt knew Sargent planned to trade Chegg stock. However, the record is completely devoid of any evidence that Klundt told Sargent when the pre-earnings call would be. The only time this could have happened would have been on April 22nd,

---

[6] The record revealed that Sargent, Klundt, and their spouses played online board games on "Jackbox" while using Facetime. For every one of these meetings, Sargent and Klundt had texted to coordinate what time they would play. They played on May 2, 2020, but there was no corresponding text message to set up the timing of game night, leading to the conclusion that this phone call may have been for the purpose of setting that time. R. 91 at 884.

during the Zoom game night, and both Klundt and Christina Sargent testified that no such conversation occurred.

Further, the timing of the trading was exclusively driven by Primer. Primer testified that he chose the May 1st date because he (incorrectly) thought the price of the options would go down as the date got closer to the earnings announcement. This testimony is confirmed by the fact that it was Primer that reached out to Sargent on May 1st to inquire about the trading, and not the other way around. R. 89 at 637-638, 658, 675.

> ● The fact that Sargent purportedly went "all-in" on Chegg several hours later on May 1, 2020, purchasing approximately $11,000 in Chegg stock and $30,000 in Chegg options ($10,000 at a strike price of $50 and $20,000 at a strike price of $40) (R. 88 at 477, 500-503, 523; R. 89 at 577-578) when the stock was.

This argument is utterly unfounded. Sargent did not go "all-in." He invested $40,000 of his over $300,000 in cash. R. 89 at 581; R. 92 at 996-997. He had just made $27,500 on trading the VIX and shorting United airlines. R. 89 at 583-584, 666. Just months prior, he had invested $54,000 with Primer to trade on the VIX. R. 88 at 471; R. 89 at 581, 665. And he had previously bought over $10,000 in "Jets" stock. R. 87 at 437-438. While a sizeable trade, it was not out of the ordinary for Sargent during this time period. The argument that he went "all-in" lacked any

evidentiary basis, especially when it was uncontroverted that Sargents' net worth was in the seven figures. Sargent Exh. 10. As such, the "all in" argument misled the jury.

- The government's expert's opinion testimony that the mix of options was particularly risky. R. 88 at 554; R. 89 at 614.

As Mr. Barrett admitted, he could not determine an accurate break-even point on the trade because he could not value the $50 options prior to expiration. R. 89 at 596-597, 543-545. That said, given that most of the options were in the money (R. 88 at 541; R. 89 at 578), and as Mr. Barrett admitted, Chegg routinely had large stock price increases over previous earnings calls, the chance of Sargent losing his entire $40,000 investment was minimal. R. 89 at 596-601.[7] More importantly, the only direct evidence on this point came from Primer, who testified that it was Primer, not Sargent, who picked the strike prices. R. 89 at 675. He personally advised Sargent that this mix of options was not risky. R. 89 at 646 ("We've got a lot of upside without risking too much"). Sargent simply went along with Primer's advice, as Sargent was a novice trader. R. 89. 639, 669, 676. Sargent made no effort to try to convince Primer to

---

[7] See R. 93 at 1140-1145.

put more of the investment on the out-of-the-money call options. R. 89 at 675-676. Moreover, he doubled down on his investment after the earnings call by buying over $10,000 in put options on May 6, 2020. R. 89 at 604-605. Indeed, it was unlikely that Sargent would lose anywhere near the entirety of his $40,000 investment should the stock price dip after the earnings call. R. 89 at 593-601; R. 93 at 1140-1145, 1195; R 101 at Exh. C.

● The government's argument that Sargent's options purchase was a lot of his income: Sargent's income as reflected on income tax returns for tax year 2018 was $103,838, for tax year 2019 as $129,639, and for tax year 2020 was $229,832. R. 86 at 312-313.

The government's own records showed that Sargent and his wife had over $300,000 in cash on hand at the time he bought Chegg stock, plus seven figures in real estate. R. 92 at 990-994, 996-997. When viewed in the appropriate context, a $10,000 stock purchase and a $30,000 options purchase is not a large investment for the Sargents.

● That Sargent had to use $8,000 worth of margin to complete his options trades. R. 87 at 438-439; Gov. Appeal. Brief at p. 9.

The government's margin argument is among its weakest. It is uncontroverted from the contemporaneous text messages that it was Primer who conducted this trade and he thought there was enough

money in the account to cover the full price of the options ($21,000 in cash plus $11,000 or so in airline stock, which he thought could be used as collateral). R. 89 at 647-48,

> Q: Okay. So still at May 4th, let's look at – what did Mr. Sargent text you at about 3:37p.m.?"
>
> A. "We had a margin issue with the JETS position and they're saying additional funds need to be added for compliance, thankfully that extra 20K should hit tomorrow."
>
> Q: How did you respond? A: "That's bizarre. We are long. I don't know what the margin issue could be. I saw they withdrew us from half the position." Q: What are you explaining to him here?
>
> A: …I thought this was odd because we had purchased this ETF with cash, so we clearly had enough money to support – there's nothing that could have happened to that stock that would leave TradeStation liable for anything. So I thought it was strange that they withdrew anything and called it a margin issue."

This exchange demonstrates that Primer thought the account would not have to go on margin because the cash balance plus the value of the Jets stock was above the purchase price of the Chegg options. R. 89 at 647-648. Indeed, Sargent had just withdrawn $50,000 from that account. R. 88 at 480; R. 89 at 666. If he was truly "all in" on Chegg, he could have wired that money back into the account and bought $80,000

worth of options rather than $30,000. That's what someone who has insider information would have done.

- A text message from Klundt to Sargent after the earnings call with the emoji, " 🤑 ", to which Sargent responded: "Congratulations on a great quarter! The analysts are swooning 👏." R. 87 at 358-359.

The district court was correct that, even when viewed in context with the government's other evidence, this emoji was not enough to prove beyond a reasonable doubt that Klundt knew that Sargent was trading on Chegg stock.

The government asked the jury to infer that Klundt and Sargent, who had been so careful never to text about any insider trading and to only set up meetings on Facetime (with the wives likely present), suddenly decided to celebrate by text once their crime was complete. R. 94 at 1275-1276. This is not a rational inference. The only rational inference is the plain and natural reading of the text messages–Sargent is congratulating Klundt, not vice versa. R. 91 at 854. This is in line with their previous text messages discussing how Klundt's compensation is tied to Chegg's stock price. R. 91 at 855-857; Klundt Exhs. 14 and 15.

Further, contrary to the government's argument (G. Br. at p. 38), the district court did not consider this emoji in isolation when making its ruling. Indeed, the district court stated:

> As I am thinking about what this boils down to, my thinking is, is the timing of Mr. Sargent's trades, the size and nature of those trades, the timing of the phone contact with Mr. Klundt, and the emoji enough to infer beyond a reasonable doubt that Mr. Klundt gave insider information to Mr. Sargent, knowing Mr. Sargent was going to trade on that information?

R. 102 at 4.

- Klundt's failure to identify that he knew Sargent in response to a lengthy FINRA questionnaire issued to him on or about September 28, 2020. R. 90 at 717-720.

The government argues in footnote 10 of its brief that the district court failed to account for the jury's "apparent [negative] assessment of Klundt's credibility." The fact is that the jury *acquitted* Klundt even though the elements of the offense for Sargent and Klundt were exactly the same, so the jury must have found Kundt credible when he testified that he did not do it.

Particularly given Klundt's acquittal, the only reasonable inference that can properly be drawn from Klundt's failure to identify Sargent, including what Klundt testified to–that he read it quickly while distracted by a newborn. R. 91 at 889, 891, 899, 901.

29

The government frames this omission as a "cover-up" and relies on a bevy of cases (*Carpenter v. United States*, 484 U.S. 19, 23 (1987), *United States v. Larrabee*, 240 F.3d 18, 23 (1st Cir. 2001), *United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975)) to argue that the jury can infer that Klundt knew Sargent was going to trade because he incorrectly filled out this FINRA form. G. Br. at 28-30. Klundt's failure to check a box on this FINRA form is not at all comparable to the obstructive efforts in these three cases. In each of those cases, the defendants took significant steps to conceal their relationship and/or directly lied to law enforcement in interviews about knowing each other. That is not remotely analogous to what happened in this case.

Notably, if this omission was part of a cover-up and Klundt in fact realized FINRA was looking into Sargent's trades, one would expect him to alert Sargent of this fact and get on the same page. Yet there is no evidence of a single call, text, email, or radio communication between the two of them between September 8, 2020 (when Klundt got the questionnaire) and October 28, 2020. R. 91 at 901-903.

Moreover, the government's argument is particularly disingenuous in light of evidence that it chose not to introduce at trial. In a recorded

interview with law enforcement on February 11, 2021, Klundt readily admitted that he knew Sargent. There was no lie or cover-up. And he explained to law enforcement what he explained to the jury—his failure to recognize one name on a lengthy form was an oversight. Indeed, it takes only a brief google search to see Sargent and Klundt's previous relationship. R. 90 at 720-21.

ii.  *The Government's Reliance on Other Insider Trading Cases is Irrelevant to the Facts of Sargent's Case*

The government cites a litany of other insider trading cases that have nothing to do with this case beyond the general subject matter. Each of the cited cases carried far "weightier" evidence than what was presented at trial against Sargent.

In *United States v. Klein*, 913 F.3d 73, 78-79 (2nd Cir. 2019), the Defendant admitted providing insider information but merely argued that he did not expect his friend to trade on it. Similarly in *United States v. Henke*, 222 F.3d 633, 639 (9th Cir. 2000), the defendants admitted possessing the material insider information, but insisted that their trades were based on something else. In Sargent's case, there is nothing but supposition that Klundt gave Sargent any material insider information. Klundt denied doing so, Primer testified that Sargent had

31

made plans to trade in Chegg prior to the pre-earnings call being announced, and there is ample evidence that Sargent had researched multiple articles on Chegg and shared those with Primer, most predicting that it would do well during COVID. R. 90 at 701; Sargent Exhs. 3-7.

In *United States v. Bhagat*, 436 F.3d 1140, 1149 (9th Cir. 2006), the government presented emails between the tipper and tippee containing the tip and the tipper affirmatively lied to the SEC during its agency investigation. In *United States v. Larrabee*, 240 F.3d 18, 21-22 (1st Cir. 2001), the defendant failed to renew his Rule 29 motion, so the First Circuit's review was only for "clear and gross injustice." Further, the evidence included direct lies to investigators about the nature of the tipper and tippee's relationship, the fact that the tippee purchased an incredible amount of stock for not only himself but also his girlfriend, and the fact that when the trades did not happen fast enough, the tippee had his secretary call and scream at the broker. *Id.* In *United States v. Heron*, 323 F. Appx 150 (3d Cir. 2009) (unpublished), there was no tipper-tippee relationship, the defendant accessed his own company's information and traded on it, and the only appellate issue revolved around whether the defendant had access to the information in question.

Indeed, this case is much more akin to *United States v. Cassese*, 428 F.3d 92 (2d Cir. 2015), in which the Second Circuit affirmed the district court's grant of a Rule 29 motion after it found a string of circumstantial evidence insufficient to support a finding of guilt beyond a reasonable doubt. In *Cassee*, the defendant purchased stock in a company one day prior to a merger announcement, tried to cancel that trade, used new and different brokerage accounts to conduct his trading, and admitted that he "made a stupid mistake." *Id.* Nonetheless, the Second Circuit found that each piece of circumstantial evidence had an equally plausible countervailing explanation and concluded: "viewed in the light most favorable to the prosecution, the evidence, at best, gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," and thus "a reasonable jury must necessarily entertain a reasonable doubt." *Id.*

The government's reliance on *United States v. Chan*, 981 F.3d 39 (1st Cir. 2020) is similarly misplaced. In *Chan*, there were two defendants, both statisticians at different pharmaceutical companies, who were subject to three-day trading blackout periods before the results of certain studies were released. The trial evidence included the fact that

one defendant withdrew cash and the other defendant deposited cash in similar amounts on the same day, and the other defendant lied about his friendship with the codefendant to the FBI during multiple in-person interviews. This showed that the defendants conspired to avoid these blackout periods by having each other trade in each other's companies' stock, which they had regularly purchased themselves other than during the blackout period. More importantly, Chan is of limited precedential value because the defendants did not challenge the sufficiency of the evidence with respect to their conspiracy convictions on appeal. *Chan*, 981 F.3d at 57 ("The defendants don't attack the conspiracy conviction in a conventional "there isn't enough evidence to support my conviction" manner. Instead, they frame their challenge as an impermissible variance from the allegations in the SSI"). With respect to the substantive securities fraud convictions, the only challenge defendants mounted on appeal was the lack of evidence that "they possessed MNPI about the relevant clinical trials at their respective companies close in time to the records of communication between them and their securities-trading activities." *Id.* Given the narrow challenge the defendants

mounted on appeal, attempting to analogize Chan to this case is misleading.

Likewise, the First Circuit's factors in *Chan* are no litmus test for what must be proven to sustain a conviction for insider trading. The statute has elements, those are what must be proven beyond a reasonable doubt, and the *Chan* factors are an ever-increasing example of "judge made" law that has crept into insider trading cases in recent years. *See* Harvard Law School Forum on Corporate Governance, United States v. Blaszczak Continues to Reshape Insider Trading Law, March 21, 2023 (https://corpgov.law.harvard.edu/2023/03/21/united-states-v-blaszczak-continues-to-reshape-insider-trading-law/) ("Blaszczak is a prime example of how the law of insider trading is judge-made.").

In any event, as the district court found, "the presence of factors doesn't tell us whether the quantum of the evidence in this case supports the level of certainty required for conviction." R. 113 at 6. And many of the *Chan* factors point in Sargent's favor. Again, the direct evidence in this case, in the form of Primer's testimony and contemporaneous text messages, shows: (1) Sargent made the decision to trade in Chegg stock prior to Klundt having any idea that he would be invited to a pre-

earnings meeting; (2) Primer was the one that chose the mix of stock options and the trading date; and (3) the majority of the money used to purchase the stock options was Sargent's profits from trading airline stocks and the VIX.

### iii.   This Court Should Affirm the District Court's Judgment of Acquittal

The main error in the government's logic comes from a misunderstanding of the quantum of proof necessary to sustain a conviction on a case built entirely on inferences. There is no dispute that a conviction can be sustained on purely circumstantial evidence nor that the jury is allowed to make reasonable inferences based on the evidence. However, the standard is not whether the inferences are reasonable, but whether they are reasonable beyond a reasonable doubt. *See United States v. Allen*, 383 F.3d 644 (7th Cir. 2004)

The circumstantial facts adduced at trial supported a finding that Sargent and Klundt were friends (R. 91 at 839, 853); that they started Study Blue (which ultimately was acquired by Chegg) (R. 91 at 839-840, 844-845); that they communicated with each other by phone and by text around the time of Chegg's Q1 2020 earnings announcement (just as they had regularly throughout the Spring of 2020) (R. 87 at 352); that Sargent

made trades in Chegg options in May 2020 (R. 88 at 520-521); and that Klundt mistakenly failed to identify Sargent's name on the FINRA list sent in September 2020. R. 90 at 719-720; R. 91 at 899-901. Altogether, the government's circumstantial case amounts to little more than a timeline and an emoji.

The direct evidence, on the other hand, favors the defense. It showed that Sargent approached Primer in mid-April 2020 intent on trading on Chegg, an online education company, because he thought it might do well during the pandemic. R. 86 at 270; R. 89 at 644-654, 657-658. Sargent did not wait until May 1, 2020 to execute his trades because he was waiting to get tipped by Klundt, he waited because Primer, his investment advisor, told him to wait. R.89 at 638, 658.

Often, the government asks the jury to infer facts from other facts. For example, if a bank robber is wearing a blue ski mask and the police find a blue ski mask in a defendant's home, the government may ask the jury to infer that the defendant is the robber. This case is different because the government asked the jury to not infer facts from other facts, but to infer the existence of elements of the offense. In so doing, the government asked the jury to pile inference upon inference. They ask the

jury to infer that: (1) Klundt provided inside information to Sargent on the May 1, 2020 phone call; (2) that the inside information was material; and (3) that Klundt knew that Sargent planned to trade based on that information (despite Klundt's testimony otherwise R. 91 at 880).

While a jury may make reasonable inferences of fact, any inferences going directly to the elements of the crime must be proved, even inferentially, beyond a reasonable doubt. *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019) ("While the district judge's inferences were reasonable, we reversed. The question was not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred beyond a reasonable doubt that the defendant was guilty as charged.") (emphasis in original).

Some of the government's inferences are potentially reasonable, but most are not. But, as noted above, each inference the government asked the jury to make has a more plausible innocent explanation. And as to certain crucial elements of the offense–such as whether Klundt knew that Sargent planned to trade in Chegg stock–there is virtually no

evidence other than rank speculation.  As such, the district court was correct to grant Sargent's Rule 29 motion, and this Court should affirm.

## II. IN THE ALTERNATIVE, THE DISTRICT COURT'S RULING SHOULD BE AFFIRMED BASED ON THE IRRECONCILABLE INCOSISTENCIES IN THE JURY'S VERDICTS

### A. <u>Standard of Review</u>

This Court reviews *de novo* the district court's grant of a judgment of acquittal.  *United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013).  This Court may affirm based on any ground adequately preserved in the record.  *See Sonnleitner v. York*, 304 F.3d 704, 717 n.8 (7th Cir. 2002).

### B. <u>Analysis</u>

Should this Court choose not to affirm Sargent's acquittal based on the insufficiency of the evidence, it should do so based on the inconsistency of the verdicts in this case.

Rightly or wrongly, our Supreme Court favors finality over accuracy or fairness.  *See United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).[8]  This Court has never had the opportunity to

---

[8] Contrast *Powell* with William Blackstones' adage, "Better that ten guilty persons escape than one innocent suffer," or Benjamin Franklin's thesis, "It is better a hundred guilty persons should escape than one innocent should suffer."  *See* Benjamin Franklin, "Letter from Benjamin Franklin to Benjamin Vaughn (Mar. 14, 1785)," *The Works of Benjamin Franklin 11*, ed. John Bigelow (1904), quoted in

directly opine on whether the rule in *Powell* is an absolute one, or whether a court may reverse a conviction based on the irreconcilable inconsistency in verdicts.

As the Sixth, Tenth, and Second Circuits have held, while *Powell* counsels against trying to reconcile inconsistent verdicts, "it is not a hard and fast rule" and it does not preclude a Court using Rule 29 to review the jurors' conclusions and see if certain conclusions on the elements of the crime as to one defendant preclude conflicting findings as to another defendant. *United States v. Randolph*, 794 F.3d 602, 610–11 (6th Cir. 2015). Where jury verdicts "are marked by such inconsistency as to indicate arbitrariness or irrationality," courts have opined that "relief may be warranted." *United States v. Lawrence*, 555 F.3d 254, 263 (6th Cir. 2009). Further, in a situation "where a guilty verdict on one count necessarily excludes a finding of guilt on another," i.e. a "mutually exclusive" verdict, a court can review the defendant's challenge to the verdict. *United States v. Ruiz*, 386 Fed.Appx. 530, 533 (6th Cir.2010) (citing *Powell,* 469 U.S. at 69, n. 8, 105 S.Ct. 471); *see also United States*

Alexander Volokh, "n Guilty Men," *University of Pennsylvania Law Review* 146 (1997): 173-216.

*v. Ashraf*, 628 F.3d 813, 823–24 (6th Cir.2011) (recognizing two exceptions to general rule that inconsistent verdicts are not reviewable); *United States v. Shippley*, 690 F.3d 1192, 1193 (10th Cir.2012) (Gorsuch, J.; same); *United States v. Pierce*, 940 F.3d 817 (2d Cir. 2019) ("We conclude that the verdicts in Pierce's case are, in the words of then-Judge Gorsuch in *Shippley*, "metaphysically impossible" to reconcile, and we agree with the Sixth Circuit in *Randoph* that the appropriate remedy for the inconsistency (where the jury was not given the opportunity to reconsider) was to set aside the guilty verdict.").

What is unique about this case as compared to *Powell* is that inconsistent verdicts typically come up in situations where: (1) there is a retrial and the inconsistency exists between a jury's conclusion in the first and second trials; or (2) multiple defendants are charged in the same trial, but under different facts or theories of liability (typically aiding and abetting).

Counsel  has not found a case that is on all fours with this case, where both defendants are tried jointly, the government argues the same facts and theory as to each defendant, each defendant is charged with the exact same statutory offenses, the elements of each offense charged apply

41

jointly to both defendants, yet the jury reaches different verdicts as to each defendant. *Cf. United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943). Such a situation as this should be a legal and logical impossibility.

The closest case to this situation is *United States v. Evans*, 486 F.3d 315 (7th Cir. 2007), which examined the concept of issue preclusion in subsequent trials of the same defendant. *Evans* was also an insider trading case. In the first trial, the jury acquitted the tipper of conspiracy and the substantive counts, acquitted the tippee (Evans) of conspiracy, and could not reach a verdict on the substantive counts against the tippee. During the second trial, the government changed its theory from a typical tipper-tippee theory to one of corporate misappropriation, under which the government argued that the tippee could have tricked the tipper into divulging material inside information. The second jury convicted the tipper based on this theory. In the second trial, the "district court altered the jury instructions from the first trial" to reflect this change in theory. *Id.* at 320. At the first trial, the jury instructions required the jury to find that the tipper personally benefited from the transaction in order to find both men guilty. *Id.* During the second trial,

the judge removed that requirement because the government was proceeding on a misappropriation theory (the same theory that this Court rejected in this case). *Id.*

On appeal, Evans argued that the jury's acquittal of the tipper in the original trial precluded the government from retrying him based on the doctrine of collateral estoppel. The Court "recognized that a narrow version of issue preclusion may still apply in criminal cases. The defendants have the burden of proving, based on the indictment, evidence, instructions, and verdict, that the jury's acquittals necessarily determined issues which, on retrial, must be proven beyond a reasonable doubt." *Id.* citing *United States v. Bailin,* 977 F.2d 270, 280–81 (7th Cir.1992); *see also United States v. Salerno,* 108 F.3d 730, 740–41 (7th Cir.1997).

In *Salerno* and *Bailin,* this Court identified three rules governing the application of issue preclusion in criminal cases: (1) the court cannot engage in hyper-technicality, but rather must examine the pleadings, evidence, charge, and other relevant material to determine whether a rational jury could have based its verdict on a different issue; (2) "issue preclusion only applies when a relevant issue in a subsequent

prosecution is an 'ultimate issue,' *i.e.,* an issue that must be proven beyond a reasonable doubt"; and (3) the defendant bears the burden of proof in proving that the ultimate issue was "necessarily determined by the prior jury." *Salerno*, 108 F.3d at 741; *see Bailin*, 977 F.2d at 280.

In applying these principles to Evan's case, this Court found that the jury could have concluded that the tipper either did not act with the requisite intent in giving the tippee the information, but that Evans did, or the jury could have found that the tipper did not receive any benefit from giving the information to Evans. Thus, assuming the jury decided the case on those theories, the government would not be estopped from retrying Evans and pursuing a different theory on retrial based on the doctrine of issue preclusion.[9]

Fair enough, but the first jury would have been estopped from convicting Evans under the tipper-tippee theory as presented in the first

---

[9] Sargent, in the alternative, would argue that *Evans* was erroneously decided. Given that the jury was instructed only on the tipper-tippee liability theory in the first trial, and the jury instructions did not appear to contain the aiding and abetting liability that this Court relied on, it is hard to see how the requirement that the tipper receive a benefit in order to find the defendant guilty only applies to the tipper and not the tippee, as *Evans* may be read to imply. At least under the tipper-tippee theory (and potential also the misappropriation theory), the requirement that the tipper receive a benefit in order to find the defendant guilty must apply equally to both defendants.

trial just as they should be estopped from convicting Sargent here. The upshot of the *Evans* decision to the present case is that this Court has indicated that it is open to concepts such as issue preclusion being a means by which courts can correct logically irreconcilable verdicts.

In Sargent's case, as the district court instructed, in order to find either defendant guilty, the jury must have found all the elements of "insider trading" to be proven beyond a reasonable doubt. R. 80 at 24 (this Court's definition of "insider trading").

For example, if the jury concluded that Klundt did not receive a benefit, as instructed, both men must be found not guilty. Specifically, the Court's instruction stated: "The tipper personally benefitted in some way, directly or indirectly, from the disclosure of the material, non-public information." R. 94 at 1245-1246. It did not say: "In order for the tipper to be found guilty . . ." *See id.* The way the jury was instructed, if any one of these six elements was not proven, both defendants must be found not guilty.

More importantly, the Court is required to examine the evidence and the theory actually presented to the jury. The government made one argument and one argument only: Klundt knowingly and intentionally

gave Sargent material inside information so he could trade based on it, and Klundt benefited from this tip based on their friendship. R. 94 at 1251, 1282, 1284-1285. The evidence/theory did not show that Sargent somehow cajoled or tricked Klundt into giving him inside information. Indeed, the government argued that this act was premeditated in that Klundt and Sargent planned to talk after the May 1, 2020 pre-earnings call for the express purpose of Klundt then providing Sargent with information that he learned on that call. R. 94 at 1270, 1273, 1290. The government did not present a misappropriation theory to the jury, nor did it plead an aiding-and-abetting liability in the indictment, and such a theory was not contained in the jury instructions. R. 93 at 1111-1112.

Further, Defendant Klundt testified unequivocally that he did not give insider information to Sargent, either intentionally or accidentally. R. 91 at 883, 904. Given the government's theory and Klundt's testimony, there is no record evidence upon which the jury could have rationally concluded that Klundt acted without the adequate scienter, but Sargent did.

Under the facts of this case, there is no theory or machination under which the jury could acquit Klundt of insider trading yet convict Sargent.

Courts are split on the remedy required in a case such as this. Compare *United States v. Randolph*, 794 F.3d 602, 610–11 (6th Cir. 2015) (defendant must be acquitted under Rule 29) and *United States v. Shippley*, 690 F.3d 1192, 1193 (10th Cir. 2012) (a new trial must be ordered). In this case, since the government pursued a singular theory against both defendants, and the jury's conclusions as to Klundt cannot be reconciled with and its verdict as to Sargent based on the same set of jury instructions, the better course is to acquit Sargent and prevent the government from re-writing history and attempting to pursue a new theory on re-trial in pursuit of a conviction over a just resolution of this case.

## III. IN THE ALTERNATIVE, THE DISTRICT COURT CORRECTLY GRANTED SARGENT'S MOTION FOR A NEW TRIAL

### A. <u>Standard of Review</u>

This Court reviews a district court's grant of a motion for a new trial for abuse of discretion. *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017). In considering a motion for a new trial, a district judge may assess the credibility of the witnesses and "may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *Id*. Since the district court judge is

best positioned to make this determination, this Court's review for abuse of discretion is "highly deferential." *Id*.

In deciding a motion for a new trial, the district court should grant one if the verdict is against the manifest weight of the evidence. *See United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989) (indicating that a new trial is warranted "where the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand"). In a motion for a new trial, "a court may properly consider the credibility of the witnesses and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice. *United States v. Washington*, 184 F.3d 653 (7th Cir. 1999) citing Wright, 3 FED. PRAC. & PROC. CRIM.2D § 553 (1982) and cases cited therein; 58 AM.JUR.2D NEW TRIAL § 391 (1989). In weighing the evidence, the district court may weigh the evidence of its own accord, considering the credibility of the witnesses. *Id*. In so doing, the judge sits as the thirteenth jury and owes no defense to the original jury's findings or credibility determinations. *United States v. Lopez*, 576 F.2d 840, 845 n.1 (10th Cir. 1978). The district court should

evaluate the testimony of both prosecution and defense witnesses. *See United States v. Lewis*, 521 F.Appx 530, 531 (6th Cir. 2013). This necessarily includes a testifying defendant.

**B.** <u>Analysis</u>

The government's argument ignores the standard of review in this case, which is for abuse of discretion.  Its only argument appears to be that the district court based its reasoning for granting a new trial on the same rationale as it granted the Rule 29 motion and failed to sufficiently separate findings.  Even if true, the proper remedy would be to remand so the district court could make more of a record on its Rule 33 ruling, but that is not necessary here.

A review of the entire record shows that an experienced district judge weighed the evidence under the appropriate Rule 33 standard and found that the manifest weight of the evidence showed that an injustice had been done.  The weighing occurred not just in the Court's December 2023 oral opinion but in its comments after it took the matter under advisement and its comments during the February 23, 2023 status hearing.

The Court was correct to grant a new trial because the verdict was against the manifest weight of the evidence. Here, for the same reasons discussed above, the manifest weight of the evidence favored Sargent. The direct evidence presented in the government's case-in-chief through Primer shows that key elements of the government's theory – namely that Sargent waited until May 1, 2020 to trade because he planned to get insider information that day and that he designed the trades in a risky manner – are not true. According to Primer, Primer picked the trading date and Primer decided the mix of trades. R. 89 at 637-639, 658, 675-676. Moreover, Klundt testified unequivocally that he never gave insider information to Sargent and that he had no idea Sargent planned to trade in Chegg stock. R. 91 at 880, 883, 903-904, 984. Given that the jury acquitted Klundt, his credibility already has its imprimatur.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of acquittal pursuant to Rule 29. Should it not do so, it should affirm the district court's grant of a new trial under Rule 33.

DATED: July 22, 2024

Respectfully submitted,

/s/ *Christopher T. Grohman*
**CHRISTOPHER T. GROHMAN**

/s/ *Ryan J. Levitt*
**RYAN J. LEVITT**

Attorneys for Defendant-Appellee.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

I, Christopher T. Grohman, attorney for Appellee, certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,663 words, including footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as modified by Local Rule 32(b), because it has been prepared in 14-pt. Century Schoolbook, a proportionally spaced typeface, using the most recently released version of Microsoft Office Word.

Respectfully submitted,

*/s/ Christopher T. Grohman*
**CHRISTOPHER T. GROHMAN**

Attorney for Defendant-Appellee.

## CERTIFICATE OF SERVICE

### When All Case Participants Are Registered For
### The Appellate CM/ECF System

I hereby certify that on the 22nd day of July, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

/s/ *Christopher T. Grohman*
**CHRISTOPHER T. GROHMAN**

Attorney for Defendant-Appellee.