In the

# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## 24-1102

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellant,**

v.

**DAVID SARGENT,**

**Defendant-Appellee.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 22 CR 15 — Manish S. Shah, *Judge.*

# REPLY BRIEF OF THE UNITED STATES

MORRIS PASQUAL
Acting United States Attorney
 for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

MATTHEW M. GETTER
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 2

I.    The District Court Erred in Granting Defendant's Motions for
      Judgment of Acquittal and for a New Trial. .......................................... 2

      A.    The Evidence Was Sufficient to Allow a Rational Jury to
            Find Sargent Guilty of the Securities Fraud Counts Beyond
            a Reasonable Doubt. .................................................................. 2

            1.    Klundt's Motive to Tip Sargent ...................................... 3

            2.    The Significance of the April 21 Text from Klundt to
                  Sargent .......................................................................... 4

            3.    Sargent's Sudden Confidence in Chegg's Prospects After
                  Speaking With Klundt ................................................... 6

            4.    Klundt's Expectation that Sargent Would Trade on the
                  Inside Information—and The Emoji ............................ 17

            5.    Klundt's False Statement to FINRA ........................... 19

            6.    Other Insider Trading Cases ...................................... 22

      B.    The District Court Improperly Granted Sargent's Motion for
            New Trial ................................................................................ 24

II.   There Were No Irreconcilable Inconsistencies Among the Jury's
      Verdict To Justify An Acquittal .......................................................... 24

CONCLUSION ................................................................................................ 29

# TABLE OF AUTHORITIES

## CASES

*United States v. Chan*, 981 F.3d 39 (1st Cir. 2020) .......................................... 23

*United States v. Evans*, 486 F.3d 315 (7th Cir. 2007)...................................... 25

*United States v. Jones*, 713 F.3d 336 (7th Cir. 2013)...................................... 22

*United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009) ................................ 26

*United States v. McGee*, 408 F.3d 966 (7th Cir. 2005) .................................... 26

*United States v. Pisman*, 443 F.3d 912 (7th Cir. 2006) ............................ 25, 26

*United States v. Powell*, 469 U.S. 57 (1984) ........................................ 25, 26, 28

*United States v. Randolph*, 794 F.3d 602 (6th Cir. 2015)................................ 26

*United States v. Shippley*, 690 F.3d 1192 (10th Cir. 2012) ............................ 26

# INTRODUCTION

The district court erred in granting defendant's motions for judgment of acquittal and, alternatively, for a new trial. On the one hand, the district found that "it is more likely than not that both Mr. Klundt and Mr. Sargent engaged in insider trading." RSA 9-10. On the other, however, the district court decided that the evidence of Sargent's guilt was not proved beyond a reasonable doubt and that no rational jury could have concluded otherwise. The district court seemed to believe that the inferences the jury drew were too speculative. But the evidence before the jury—both direct and circumstantial—was more than sufficient for it rationally to have concluded that the elements of each offense of conviction were proved beyond a reasonable doubt.

In his response brief, Sargent makes the same mistake as did the district court, namely, he takes each individual bit of evidence and tries to explain it away as having an innocent explanation or concluding that the jury put too much weight on that evidence. He argues that the district court correctly concluded that there were too many inferences the jury had to draw for it rationally to have concluded that each element of the offenses was proved beyond a reasonable doubt. While the jury surely had to make certain inferences to find Sargent guilty, those inferences not only were rational, they were well-supported by both direct and circumstantial evidence. While there was no recording of the May 1 phone call between Klundt and Sargent and no

email or text confirming exactly what Klundt said to Sargent, there did not need to be, and there was ample evidence for a rational jury to have concluded that during that phone call Klundt passed inside information to Sargent knowing Sargent would trade on it.

The district court erred in concluding otherwise, and on that basis, setting aside the jury's verdict.

## ARGUMENT

### I. The District Court Erred in Granting Defendant's Motions for Judgment of Acquittal and for a New Trial.

#### A. The Evidence Was Sufficient to Allow a Rational Jury to Find Sargent Guilty of the Securities Fraud Counts Beyond a Reasonable Doubt.

The district court stated that it was "possible, even probable that Klundt tipped Sargent" during their May 1, 2020 phone call, RSA 7, and went even further by adding that "[i]n my view, it is more likely than not that both Mr. Klundt and Mr. Sargent engaged in insider trading . . .", RSA 9-10. But the district court still concluded that the evidence did not allow a rational jury to conclude beyond a reasonable doubt that Klundt passed inside information to Sargent so that Sargent could trade on it. RSA 7-8. In so concluding, the district court ignored or discounted significant evidence providing a rational jury the basis to draw that conclusion with which the district court did not

agree and for which it substituted its own evaluation of the evidence for that of a rational jury.

In his response brief, Sargent attempts to justify the district court's erroneous conclusion by attempting to explain why each bit of evidence—many of which were undisputed—should have led the jury to a different conclusion than the one it ultimately reached. The evidence presented to the jury taken as a whole did not constitute a tenuous chain of inferences, but rather served as a set of facts from which this rational jury drew the conclusions—the inferences if you will—that each of the elements of the securities fraud charges were met beyond a reasonable doubt.

### 1.    Klundt's Motive to Tip Sargent

The evidence at trial showed that Klundt and Sargent had a close friendship that dated back to college where they started StudyBlue. After leaving the company to attend law school, Sargent missed out years later on a sizeable financial windfall for Klundt, who had stayed with StudyBlue and helped grow it into the company that Chegg eventually acquired. A rational jury was well within its rights to impute to Klundt a motive to provide his good friend Sargent with information that Sargent could use finally to reap some benefit from his years-earlier work with StudyBlue. In other words, Klundt stood to gain a personal, albeit non-pecuniary, benefit from providing the inside information to Sargent. While acknowledging that Klundt and Sargent

3

"had a friendly relationship," RSA 7, the district court did not appear to give much weight to the closeness and length of their friendship, and how their close relationship and Sargent's missed opportunity to monetize Chegg's acquisition of StudyBlue provided a rational jury with the basis to conclude that Klundt had a strong motive to tip inside information to Sargent.

### 2. The Significance of the April 21 Text from Klundt to Sargent

The jury was presented with undisputed evidence that Klundt and Sargent, with their spouses, spoke by Zoom on April 20, 2020, and that the next day (April 21) Klundt texted Sargent to make sure Sargent knew the correct date of the upcoming May 4 Chegg earnings call. Both the district court and the defendant seem to discount the significance of that text. But the text showed that Klundt knew Sargent was interested in the upcoming public earnings call, enough so that Klundt wanted to ensure that Sargent knew the correct date.

For its part, the district court stated that there was no evidence Klundt was aware of Sargent's trading practices, or that "Sargent trading in Chegg around the time of the earnings call was some mutually shared topic." RSA 7. Far from it, the fact that Klundt texted Sargent to ensure he knew the correct date of the earnings call, coupled with their May 1 call immediately after the Chegg internal meeting where Klundt learned the inside information, followed

by Sargent's quick and aggressive purchases of Chegg equities after their call, and then Klundt's unexplained but understood texted emoji to Sargent hours after the earnings call, all provided a basis for any rational jury to conclude that Sargent trading in Chegg stock was a "mutually shared topic" and that Klundt did, in fact, tip Sargent during their call knowing Sargent would trade on it.

In his response brief, Sargent tries to explain away the significance of Klundt's April 21 text to Sargent by arguing that Sargent already had told Primer he would trade in Chegg equities because he thought it would benefit from the pandemic. Def. Br. 20. But the phone records show that not to be true. The phone records show that Sargent and Primer spoke on April 21, the day *after* Klundt and Sargent and their spouses spoke by Zoom in a conversation that must have included a discussion of the Chegg earnings call because Klundt needed to provide Sargent with correct information about the date of the Chegg earnings call on April 21. G. Ex. 60. Sargent and Primer's telephone conversation on April 21 was the first time they had spoken on the phone since March 23. Tr. 758-59. In other words, the jury properly inferred that Klundt was aware of Sargent's interest in the Chegg earnings call the day before Sargent expressed to Primer his interest in Chegg. Moreover, as to Sargent's separate communications on April 21 with Klundt and Primer, Klundt's corrective text to Sargent about the May 4 earnings call was at 10:30 a.m.

Central Time, followed by Sargent placing a limit order for 28 shares of Chegg stock at 11:50 a.m. Central Time, and *then* two calls between Sargent and Primer at 2:48 and 3:38 p.m. that day. G. Ex. 60. So, in addition to the fact that Klundt and Sargent spoke on April 20 about Chegg's earnings call, even Klundt's follow-up text to Sargent about the earnings call occurred before Sargent ever told Primer about his interest in Chegg equities.

### 3. Sargent's Sudden Confidence in Chegg's Prospects After Speaking With Klundt

The district court improperly discounted the evidence concerning Sargent's sudden "bullish" position on Chegg equities after his May 1 conversation with Klundt. RSA 6. The evidence showed that on the morning of April 21, 2020, the day after he spoke with Klundt about the schedule of the upcoming earnings call and less than two hours after Klundt texted him the correct date of the earnings call, Sargent placed a limit order for 28 shares of Chegg stock. G. Ex. 60. The $35.15 price limit Sargent placed meant he lacked confidence in the prospects for Chegg's stock. Yet on May 1, only 10 days later, and almost immediately after speaking with Klundt following Klundt's attendance at the Chegg internal meeting, Sargent purchased 271 shares of Chegg stock at just over $42 per share, Tr. 377-79, and about an hour later he purchased 214 Chegg call options that were expiring in only two weeks and many of which had a strike price of $50 at a time when the stock was trading

6

at about $42 per share, Tr. 429-434, G.Ex. 60. In other words, it was a risky financial move.

Sargent's efforts to downplay the riskiness of his trades are unavailing. As an initial matter, the district court said nothing in its ruling about the riskiness of Sargent's trades in Chegg, including how his trades represented a significant portion of his income. Yet, a rational jury properly could consider that Sargent spent all but about $5 in his Vanguard IRA account on Chegg stock shares and that he emptied and even traded on margin from his TradeStation account to buy Chegg call options. That rational jury also could consider that the over $41,000 he spent purchasing Chegg equities *in one day* represented a significant percentage of his and his wife's joint *annual* income for each of the years 2018 and 2019.

Sargent's response to the margin trading issue is inconsistent with the record. Def. Br. 26-28. He appears to argue that Primer had misunderstood the amount of funds available in the account to trade because Primer thought that the cash in the account plus the JETS shares in the account was sufficient to cover the purchase of the Chegg options. Yet putting aside the fact that this account ending in x4860 was in Sargent's name, Tr. 430, the evidence shows that Primer and Sargent's confusion during their May 4 texts was not about *whether* the Chegg options were purchased partially on margin; rather, it was about *why* TradeStation was making a margin call and a concentration call.

A representative of TradeStation testified that before the options were purchased, there was a little under $22,000 cash in that account. Tr. 434-35. Since the Chegg options Sargent purchased that day cost about $30,000, TradeStation essentially loaned Sargent the remainder of the approximately $8,000 he needed to purchase the Chegg options by allowing him to buy on margin using the JETS ETF shares already in that account as collateral. Tr. 435-38. Because there are limits to how much can be provided to trade on margin as a percentage of the equity/collateral and what percentage of the account could be in one position, Trade Station made a margin call and a concentration call on May 4, 2020, Tr. 438-40, 453-60, which appears to have been what Sargent and Primer were discussing while they listened to the May 4 earnings call.

Defendant seems to acknowledge that Sargent had no doubt he was purchasing the Chegg options partially on margin. Def. Br. 27. Their confusion about the basis for the margin and concentration calls in no way undermines the fact that Sargent purchased the Chegg options on margin and that he knew he was doing so. Indeed, the fact that TradeStation had concerns about the leveraged and concentrated position Sargent took on May 1 adds further support to a rational jury's conclusion that Sargent's purchase of Chegg options was risky. The district court did not address this piece of evidence in overturning the verdict.

For his part, Sargent downplays those facts by saying that Sargent had significant assets and earlier trading profits. But the jury rejected that argument at trial, as it was entitled to do. Much of the evidence Sargent introduced at trial about assets dealt with the value of properties he and his wife owned and cash that was in his wife's personal account. A rational jury was entitled to conclude that the operative figure for evaluating Sargent's risk tolerance for trades unsupported by inside information should be based on the couple's joint annual income, rather than on his wife's bank account or buildings that he quickly would had to have refinanced or sold to compensate for the large percentage of their annual income he put at risk through his one day of trading.

The district court minimized the significance of Sargent's sudden bullishness about Chegg stock by stating that while a jury reasonably could infer that Sargent became more interested and more positive about trading in Chegg after his call with Klundt, the basis for his bullishness could have come from many different types of information, "including public or immaterial information about Chegg and the economy during the pandemic," and that a jury would have to guess that Klundt disclosed inside information. RSA 6. In minimizing the importance of Sargent's sudden and drastic change of heart concerning Chegg's short-term prospects immediately after speaking with Klundt, the district court did precisely what it was not supposed to do: it

substituted its own inference for that of the jury. The district court engaged in its own speculation about what may have caused Sargent's sudden bullishness after speaking with Klundt. Indeed, given the close temporal proximity of Sargent's reluctance to spend too much on April 21, 2020, versus his emptying two of his accounts to buy Chegg equities 10 days later, just after speaking with Klundt, the jury's conclusion not only was rational, it was firmly rooted in the evidence.

Sargent attempts to defend the district court's discount of Sargent's April 21 limit order for Chegg shares by focusing this Court's attention on his friend David Primer. Yet Primer had nothing to do with Sargent's limit order on April 21. The timeline shows that Sargent placed the limit order on April 21, after receiving Klundt's corrective text about the date of the Chegg earnings call, but before he even had spoken to Primer of his interest in Chegg. G. Ex. 60. Whether Primer advised Sargent to wait until closer to the date of the earnings call to purchase Chegg call *options* has nothing to do with Sargent's timidity concerning Chegg's prospects demonstrated by his already having placed a limit order on Chegg *stock*.

Further, Sargent—and to a certain degree the district court—overstate the significance of certain analyst reports or other publicly available or even immaterial information about Chegg. Chegg's Tracey Ford testified that there had been uncertainty and angst within Chegg about its prospects before the

earnings call, Tr. 136-37, and that Wall Street analysts had negative sentiment about Chegg's performance, including JPMorgan downgrading Chegg in an April 16, 2020 report, Tr. 131-36. While Sargent introduced into evidence certain articles that discussed Chegg or the impact of COVID, it was within the jury's purview to decide whether these articles were the impetus for Sargent's sudden bullishness about Chegg, or whether Sargent's change of heart about Chegg on May 1 was a result of information Klundt gave to him just before he purchased Chegg equities that day. A rational jury could have decided—and appears here to have done so—that something Klundt told him in their May 1 call was what prompted Sargent's decision to buy.

The district court failed to give adequate weight to the timing of the May 1 call between Klundt and Sargent, again substituting its own evaluation of the evidence for that of the jury. The district court acknowledged that there was "suspicious evidence surrounding the phone call." RSA 5-6. Indeed, Sargent waited until just after speaking with Klundt, who himself had just learned about Chegg's earnings, before purchasing Chegg stock and call options. There is no confusion about the timing of Sargent's purchases of Chegg equities. They occurred within the two hours following his call with Klundt. The chronology provides direct evidence that even though Sargent told Primer on April 21 that he thought Chegg would do well during COVID, he waited until just after speaking to Klundt to purchase Chegg equities. It was neither

a tenuous nor a far-fetched inference for the jury to conclude that Sargent intentionally waited until after he had spoken to Klundt to make those purchases.

Sargent defends the district court's mere finding of "suspicion" surrounding the phone call by claiming that the timing of the trading was "exclusively driven" by Primer. Def. Br. 24. That was not what the evidence showed. First, as mentioned above, Sargent placed a limit order on Chegg stock shares on April 21, before he ever had spoken to Primer about Sargent's interest in Chegg. G. Ex. 60. Second, Primer testified that when Sargent called him in April to tell him of "his interest in what could be done with options," Tr. 631, Sargent was "consulting" with Primer based on Primer's familiarity with trading options and his ability to candidly and correctly analyze the proper risk-reward ratio for creating an options position, Tr. 635-36. Primer made clear in his testimony that the Chegg options he helped Sargent purchase were exclusively for Sargent personally. Tr. 634-35. He testified that he himself had no expertise in how to research specific companies, Tr. 629, and he did no research on the fundamentals of Chegg's business.[1]

Primer testified that he "advocated" for waiting until closer to the time of the earnings call, Tr. 638, but that it was Sargent's decision to purchase the

---

[1] He said that the only thing he looked at was that Chegg's stock price was higher in January or February than it was in May. Tr. 640-41.

options, Tr. 639. Contrary to Sargent's argument that the trades were "locked and loaded" prior to Sargent's May 1 call with Klundt, Def. Br. 15, Primer testified that the decision was made about what Chegg options to buy and how many during the course of their May 1 telephone calls. Tr. 638-39. Moreover, Primer testified that during those calls on the afternoon of May 1, Primer and Sargent discussed the specific quantities and strike prices to purchase "because it was his [Sargent's] account" and Primer wanted to make sure that Sargent approved the options purchases Primer would execute on Sargent's behalf. Tr. 638-39. Primer specifically testified that the decision about what Chegg options to purchase and how many was made during those May 1 telephone calls, and that it was Sargent's decision. Tr. 639.

As for Sargent's argument that Primer exclusively directed the timing of the options purchases, Primer testified that he reached out to Sargent by text on the morning of May 1, 2020, because they previously had discussed purchasing Chegg options close to the time of the May 4 earnings call, and with the earnings call just a couple business days away, Primer felt they should "at least look at the prices and talk about whether or not we want to pull the trigger." Tr. 637-38. Primer's testimony that Sargent still needed to decide whether to "pull the trigger" on the options purchases is further evidence that Sargent had not made a decision about those trades until after he had spoken to Klundt, a fact not discussed by the district court but well within the jury's

right to consider. Moreover, when Sargent responded to Primer that they could speak at around 1:00 p.m., the jury was entitled to consider that the April 22, 2020 Chegg email to insiders, including Klundt, had estimated the May 1 internal call would end at about 12:30 Central Time. Tr. 150-51. The district court made no mention in its ruling about the reason Sargent deflected Primer's early morning efforts to discuss the final decision to purchase Chegg options until after the time Klundt expected the Chegg internal call would end, but a rational jury could have done so.

Defendant's argument that there was no evidence Klundt knew material inside information would be shared at the May 1 meeting is undermined by the April 22 emailed invitation to the May 1 meeting, in which the subject line was listed as "E-Staff Listen-in on Earnings Script Recording," Tr. 150, and in which the invited attendees were instructed to use headphones during the call, Tr. 152. A rational jury could infer that Klundt understood that inside information would be discussed during this meeting. The fact that neither Klundt nor Sargent's wife recalls discussing the May 1 meeting during the two couples' April 22 Zoom call was testimony for the jury properly to evaluate.

The district court also appears not to have considered the undisputed evidence of Sargent's purchase on May 1, 2020, of 271 shares of Chegg stock (as opposed to options) at about $42 per share just over 30 minutes after he completed his call with Klundt. G. Ex. 60. During that intervening time,

Sargent had not spoken with Primer. *Id.* Sargent's market purchase of those Chegg shares was made without Primer's input, as opposed to the advice Primer gave to Sargent about options. Had Sargent's "bullishness" about Chegg's prospects truly been based on Sargent's review of opinion pieces and analyses (even if done by a college student), then Sargent could have and would have purchased those shares with a market order on April 21 for an extra few dollars, since stock prices don't "decay," rather than waiting until after just after he had spoken with Klundt on May 1.

Had Sargent's purchases of Chegg securities been based on his supposed research into Chegg or general economic conditions during the pandemic, as the district court implied could have been possible, RSA 6, then not only would he have purchased Chegg stock with a market order on April 21—and a more aggressive one at that—he would have to have been considered an investing savant. Again, Tracey Ford testified as to the uncertainty and "angst" within Chegg as well as Wall Street's negative sentiments, and Klundt himself testified about his relief upon learning of the upcoming positive earnings report. Tr. 878, 886, 919-21, 944-47. They were not alone in their lack of optimism about Chegg's short-term prospects.

Kevin Barrett, the government's expert witness, testified that the sharp increases in the price and trading volume of Chegg's stock in the days after the May 4 earnings announcement shows that the market was completely taken

by surprise by Chegg's earnings release. Tr. 550-551. Moreover, defendant's own expert testified that options trading around the time of earnings announcements usually involves significant research of various factors and metrics, and that he was unaware of any such research that Sargent had conducted. Tr. 1162-64. Given Sargent's own admission that he was "a novice trader," Def. Br. 25, a rational jury could have concluded that Sargent would not have wagered this kind of money on what amounted to an uneducated guess, absent help in the form of inside information. In substituting its own inferences for that of the jury, the district court articulated no analysis concerning the near total absence of any rationale for Sargent to have made those trades absent inside information from Klundt.

Primer's testimony about the substance and timing of his calls with Sargent provided the jury with further support for its conclusion that Sargent waited until after he had spoken with Klundt and received inside information before making a final decision about purchasing Chegg stock and options. In its ruling, the district court appears to have made no mention of the specifics of Sargent's interactions—or lack thereof—with Primer about Chegg stock and options purchases on and prior to May 1 in concluding there was insufficient evidence to raise the level of suspicion about Sargent and Klundt's May 1 call from one that preponderates toward a conclusion of insider trading to one that proves it beyond a reasonable doubt. But a rational jury could have considered

this evidence in concluding that Sargent's purchases of Chegg equities was based on inside information.

### 4. Klundt's Expectation that Sargent Would Trade on the Inside Information—and The Emoji

In deciding that the record was "bereft of evidence" that Klundt tipped inside information to Sargent so that Sargent could trade on it, the district court considered only the money-faced emoji and decided that was not enough. RSA 7. In not considering the other evidence supporting the jury's rational conclusion that Klundt tipped Sargent so that Sargent could trade on the information, the district court erred.

Trying to refute the government's argument that the district court viewed the emoji in isolation, Sargent's response brief cites language in which the district court said it was thinking about a number of things, including the emoji. Def. Br. 29. However, the court's language Sargent cites was not taken from its December 2023 oral ruling on the motions for judgment of acquittal and new trial. Rather, it was taken from a February 23, 2023 status hearing— about 10 months before its ruling—in which the district court discussed with the parties what was its then current thinking about the post-trial briefs that had not yet been filed in order to help the parties plan their next steps. R. 102, at 2-4. When the district court eventually ruled on the later-filed post-trial motions, it considered the emoji in isolation when discussing the element

requiring Klundt's expectation that Sargent would trade on the information Klundt had tipped him. RSA 7.

In deciding there was insufficient evidence for a rational jury to conclude Klundt knew Sargent would trade on the inside information, the district court did not address the money-faced emoji Klundt sent to Sargent in the context of their April 20 discussion about the Chegg earnings call, as evidenced by Klundt's corrective text to Sargent on April 21, 2020, which showed Klundt knew the Chegg earnings call was important enough to Sargent for Klundt to ensure Sargent knew the correct date. Nor did it consider the emoji in the context of the May 1 phone call between them that occurred minutes after the internal Chegg meeting ended. While the district acknowledged that Klundt did not send this emoji to anyone else and that Sargent's response text made it clear that the text was indeed a reference to the value of Chegg stock, RSA 6, the district court seemed not to find persuasive the fact that the emoji was unaccompanied by any words of explanation, which means that in order for Sargent to have known what Klundt was referencing, Sargent and Klundt had to have had a mutual understanding that Sargent himself stood to have gained from the earnings announcement.

Sargent's argument that this inference was not rational and that the "only rational" inference for the jury was that Sargent was congratulating Klundt, Def. Br. 28, ignores that there were two rational inferences the jury

could have made. First, it could have inferred that Klundt was congratulating himself and his good fortune because his unvested stock might someday become worth more money. Or, second, it could have inferred that Klundt's unexplained emoji was a nod to Sargent for the money Sargent likely had made on the tip. Given that the jury had the opportunity to see and hear Klundt testify at trial, to observe his demeanor, to consider his long-standing and close relationship with Sargent, and to note that Sargent's earlier departure from StudyBlue meant Sargent had missed out on this potential windfall, a rational jury easily could have concluded that Klundt, a former Eagle Scout, Tr. 831, was not the type of person to brag about his own success to a friend who had missed out on the opportunity. Drawing that second conclusion was entirely rational and would justify the jury's conclusion that Klundt sent Sargent the otherwise unexplained text to express happiness for his friend's financial gain.

**5.    Klundt's False Statement to FINRA**

The jury was entitled to conclude that Klundt intentionally hid from FINRA his relationship with Sargent because he did not want his tip of inside information to be discovered. As defendant notes, Klundt testified that omitting to FINRA that he knew Sargent was caused by his distraction with a new child. Def. Br. 29. Sargent then argues that the jury's acquittal of Klundt means it must have believed his testimony, so that the only reasonable

19

inference to have been drawn is that the jury believed Klundt just made a mistake. *Id.* Defendant's argument itself is a chain of unsupported inferences.

At bottom, Klundt was presented with a five-page list of names and locations associated with those names. David Sargent, of Chicago, Illinois, was one of those names. Tr. 717; G. Ex. 20. Klundt paid careful enough attention to this letter and its instructions that he answered the question using almost exactly the same language with which the question was asked. G. Exs. 19, 20. Chegg provided the questionnaire to Klundt and other Chegg insiders on September 28, 2020, and it gave recipients four days—until October 2, 2020—to respond. G. Ex. 19. Klundt responded to the email only a few hours after receiving it. G. Ex. 20.

The jury was entitled to disbelieve that Klundt, given his obvious intelligence and the way in which he worded his response, simply had not been paying attention when he denied to FINRA that he knew David Sargent. Had he answered that he knew Sargent, then he would have had to describe the nature and history of his relationship with Sargent, the frequency of their contact with each other, and a description of any contacts they had between April 1, 2020, and May 4, 2020. G. Ex. 19, at 16. Admitting he knew Sargent would have required him to explain: (1) their April 20 Zoom call in which they discussed the upcoming Chegg earnings call; (2) his April 21 text in which he made sure Sargent knew the correct date of the Chegg earnings call; (3) their

May 1 telephone call that happened minutes after the internal Chegg earnings meeting ended; and (4) his May 4 emoji text and Sargent's response. Given what Sargent knew he would have had to tell FINRA about his communications with Sargent between April 1 and May 4, 2020, a rational jury was entitled not to believe Klundt's explanation that he simply didn't notice Sargent's name on the list.

As for Sargent's argument that Klundt's later admission to the FBI that he knew Sargent somehow corroborated Klundt's testimony that he had not intentionally lied to FINRA, one must note that the circumstances of those two encounters with investigators were quite different. With the FINRA questionnaire, the jury rationally could have concluded that Klundt thought he simply could make the issue go away by denying he knew Sargent and thereby not disclosing his contacts with Sargent during that period. With the FBI interview, there was far less wiggle room to say he didn't know Sargent if the FBI was asking him about his communications with Sargent.

Finally, the fact that the jury acquitted Klundt has no bearing on whether it believed Klundt's explanation for his lie of omission to FINRA. The fact that the jury convicted Sargent means it concluded that Klundt passed inside information to Sargent with the expectation Sargent would trade on it, which were elements the jury had to have found to convict Sargent. As

explained below, the jury's acquittal of Klundt could have been nullification or based on its application of the district court's instructions.

The district court improperly failed to accord a rational jury with the proper deference to infer from Klundt's concealment that Klundt knew he earlier had tipped Sargent, that he lied because he knew admitting the truth would expose his crime.

### 6. Other Insider Trading Cases

Sargent's efforts to distinguish other insider trading cases the government cited in its opening brief add nothing to his argument. The point of those cases is that insider trading cases often are based largely on circumstantial evidence, and that juries are entitled to draw inferences and reach verdicts based on circumstantial evidence. Of that last point there appears to be no argument. Even in *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013)(which did not involve insider trading), this Court held that cases based entirely on circumstantial evidence are not unusual and can provide constitutionally sufficient proof beyond a reasonable doubt. The question is whether the evidence is enough for a rational jury to have concluded that the evidence—direct, circumstantial, or both—was sufficient for a rational jury to have returned a verdict of guilty. While in *Jones* it did not, that was because the evidence in *Jones* appeared to have been driven by Jones's mere association with criminals. *Id.*, at 347.

But with regard to the insider trading cases Sargent discusses in his response brief, Sargent makes the same mistake the district court made in its ruling: they both looked at other cases and weighed the strength of the evidence in those cases against the strength of the evidence in this case and simply decided the other cases were "weightier," *see e.g.*, RSA 8 (discussing *United States v. Chan*, 981 F.3d 39 (1st Cir. 2020)). The district court's conclusion that the evidence in *Chan* was "weightier" is itself questionable, as are Sargent's efforts to distinguish the case and claim *Chan* was of limited precedential value—an ironic argument considering both the district court and Sargent rely on *Chan* to conclude the evidence here is too circumstantial to justify a guilty verdict. What the law requires in deciding a motion for judgment of acquittal is not to decide which case has better evidence, but rather whether the evidence in the present case was enough to support a rational jury returning a verdict of guilty. The evidence in this case was sufficient for a rational jury to have concluded that Sargent was guilty of securities fraud.

**B. The District Court Improperly Granted Sargent's Motion for New Trial**

The district court granted Sargent's motion for a new trial because in its view the evidence was insufficient to sustain a verdict of guilty, and, in the alternative, the verdict was so contrary to the weight of the evidence that a new trial is required in the interests of justice. RSA 9. But the stated basis for its ruling lacked any explanation other than its already-stated decision that a rational jury could not have arrived at a guilty verdict. It stated no basis why the verdict was so contrary to the weight of the evidence that the interests of justice would require a new trial. In his response, Sargent offers no additional justification for the district court's decision to grant the motion for a new trial. Lacking any such reasons, reversing the grant of a judgment of acquittal also necessitates reversing the district court's decision to grant a new trial.

**II. There Were No Irreconcilable Inconsistencies Among the Jury's Verdict To Justify An Acquittal**

There is no basis to overturn the jury's guilty verdict as to Sargent based on its acquittal of Klundt for the same charges. Sargent argues that the jury's acquittal on Klundt for the same substantive charges (Counts 2-7) requires overturning the guilty verdicts as to Sargent because the jury's verdicts are legally and logically irreconcilable. Defendant's argument was flatly rejected by the district court, which stated that the jury was told to consider each

defendant separately, and that "it was not impermissible for the jury to arrive at different verdicts for the two defendants. Any inconsistency there is tolerated by our jury system." RSA 8-9. Defendant's argument is undermined by the law concerning inconsistent verdicts as well as the instructions the jury was provided here.

In *United States v. Powell*, 469 U.S. 57 (1984), the Supreme Court reaffirmed that inconsistent jury verdicts should not be disturbed. Even where a jury convicts on a compound offense and acquits on a predicate offense, the Court recognized that a jury may have arrived at an acquittal based on mistake, compromise, or lenity. *Powell*, 469 U.S. at 64-65. Even though inconsistent verdicts most certainly mean the jury has not followed the trial court's instructions, "it is unclear whose ox has been gored." *Id.*, at 65. "Given this uncertainty, and the fact that the government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant a new trial on the conviction as a matter of course." *Id.* Any individualized inquiry into the actual basis for the jury's inconsistent verdict would require an inquiry into the jury's deliberations, which courts generally do not undertake. *Id.*, at 66.

The Seventh Circuit has followed the holding in *Powell* in rejecting arguments about inconsistent verdicts. *See United States v. Evans*, 486 F.3d 315, 322-24 (7th Cir. 2007); *United States v. Pisman*, 443 F.3d 912, 914-15 (7th

Cir. 2006).[2] In *United States v. McGee*, 408 F.3d 966, 985 (7th Cir. 2005), for example, the Seventh Circuit affirmed a conviction for use of a telephone to facilitate the conspiracy even though the defendant was acquitted of the underlying conspiracy charge.

The out-of-circuit cases defendant cites are inapposite. For instance, in *United States v. Randolph*, 794 F.3d 602 (6th Cir. 2015), the jury returned a special verdict that negated one of the elements of the offense of conviction. The court explained that *Powell* did not apply because the inconsistency concerned "an internal inconsistency in the same count, as it relates to the same defendant, in the same verdict." *Id.* at 611. The situation here is different because the jury's decision varied across defendants and could have been a product of mistake, compromise, or lenity as to one defendant but not the other. *See United States v. Shippley*, 690 F.3d 1192, 1195-96 (10th Cir. 2012) ("*Powell* and *Dotterweich* involved logical inconsistencies *between counts and between defendants*. However illogical, the verdicts in those cases could be given full effect.")(emphasis in original). In *United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009), the court carved out a narrow exception where a sentence

---

[2] In *Pisman*, the Seventh Circuit noted that *Powell* does not apply where two guilty verdicts cannot co-exist, *Pisman*, 443 F.3d at 914 (citing *Powell*, 469 U.S. at 68-69, n.8), a situation that does not apply here. That situation is the opposite: where a guilty verdict on one count logically excludes a finding of guilt on the other.

of death is the product of irrationality based on a jury's findings on other counts. *See id.* at 263. The exception does not apply here.

There is no legal basis for the Court to overturn Sargent's conviction on the grounds that his conviction is inconsistent with Klundt's acquittal on those same charges. In any event, there would be no basis even to find that the convictions on Sargent were inconsistent with Klundt being acquitted. The jury was instructed that it must find that the Internet was used to purchase the securities and that each defendant knew or could reasonably foresee that the Internet was used in furtherance of the fraudulent conduct. The jury could have found that Sargent had this knowledge but Klundt did not since Sargent knew how the trades would occur but Klundt may not have. Moreover, the jury could have found that the government did not meet its burden of proof as to Klundt's mental state. The jury was instructed that the government was required to prove the defendant acted willfully in order to be convicted of insider trading under Counts 2-4. Tr. 1243. The jury was further instructed that a person acts "willfully" if he acts knowingly and with the intent to do something "that he knows is against the law," even if the government is not required to prove he knew his actions violated any particular law. Tr. 1247.

The jury may have focused on whether the defendants knew their actions were "against the law," to conclude that Sargent, who was an attorney, understood his conduct was against the law—rather than just being

27

wrongful—while Klundt, who was not an attorney, did not understand his actions were against the law. If the jury differentiated between the two defendants on that basis, then its decision should not be seen as irrational, illogical, or arbitrary. The jury may well have mistakenly applied the willfulness standard to Counts 5-7 as well, but the cases suggest that such sorts of mistakes are not a basis to overturn a verdict.

Finally, the jury simply may have decided that Klundt was guilty of the substantive securities fraud charges too but declined to convict him as some sort of compromise among the jurors. They also may have acquitted Klundt because they simply liked him. Such rationales for acquitting Klundt would be a form of nullification and a product of the jury not following the district court's instructions to the letter. But such a decision would exemplify the Court's warning in *Powell* that one does not know whose ox was gored, and an individualized inquiry into the basis for a jury's apparent inconsistent verdict would require an inquiry into the jury's deliberations, which courts generally do not undertake.

The verdicts as to Sargent and Klundt do not create a basis to overturn the jury's verdict or to order a new trial.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment granting of Sargent's motion for judgment of acquittal and, alternatively, his motion for new trial, and reinstate the verdict of guilty against Sargent.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

DEBRA RIGGS BONAMICI
Assistant United States Attorney
Criminal Division Counsel

/s/ *Matthew M. Getter*
MATTHEW M. GETTER
Assistant United States Attorney

# RULE 32 CERTIFICATION

I hereby certify that:

1.  This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 6,950 words.

2.  This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Matthew M. Getter*
        MATTHEW M. GETTER
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois
        (312) 886-7651

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2024, I electronically filed the foregoing Reply Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By:  /s/ *Matthew M. Getter*
MATTHEW M. GETTER
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 886-7651